. JjDREW, J.
On October 3, 1994, Orville “Diddle” Hodge was involved in a vehicular accident with a pedestrian named Joe L. Ragland. The legal questions are, at the time of the accident: (1) Was Mr. Hodge an employee of Leroy Piercy, d/b/a Lee’s Electric; and if so, (2) Was Mr. Hodge in the course and scope of his employment? The trial court answered these questions in the negative. We agree and affirm the judgment for the following reasons.

PROCEDURAL HISTORY

An elderly man, Ragland was walking across the parking lot of the Pñot, a gas/diesel store combined with a Wendy’s Restaurant in Rayville when he was struck by Hodge’s vehicle. Ragland sustained a fractured pelvis and had a lengthy, difficult recovery period. The trial court’s determinations that the accident was caused solely by Hodge’s negligence and that Ragland’s depression resulted in part from the accident are not at issue in this appeal. Mr. and Mrs. Ragland initially sued Hodge and his insurer, Trinity Universal Insurance' Company. In an amended petition, the plaintiffs added Leroy Piercy, d/b/a Lee’s Electric as a defendant and asserted vicarious liability arising out of Hodge’s *569 employment with Lee’s Electric. Subsequently, plaintiffs named as a defendant Lee’s insurer, American Central Insurance Company.
Finding Hodge to be 100% at fault in causing the accident, the trial court rendered judgment in favor of the plaintiffs against Hodge and his insurer (to the extent of the policy limits) for medical expenses, general damages and loss of consortium totaling $108,071.96, plus legal interest and costs. Plaintiffs’ claims against Leroy Piercy, d/b/a Lee’s Electric and American Central Insurance Company were dismissed with prejudice.
The plaintiffs appealed and designated particular parts of the trial record for the appellate record and included only the depositions and trial testimony of |¡>Hodge and the trial testimony of Piercy. On motion of Piercy, d/b/a Lee’s Electric and American Central, this court ordered that the appellate record be supplemented with the testimony of Nora Bullock.

TESTIMONY AND EVIDENCE

September 19, 1995 Deposition of Hodge

Hodge stated that he was currently employed by Lee’s Electric and that he was employed by Lee’s Electric on the date of this accident. He described his duties as working in the shop and on cotton gins for which he received $500 per week based upon 50 hours per week, although his hours varied greatly. Hodge stated he and everyone else worked 24 hours a day, particularly during ginning season from August to December. Hodge had an extension of Lee’s Electric phone line in his trailer which was located next to the shop. Hodge did not recall what he had done the morning before the accident. Prior to the mishap he had gone to Wendy’s in his personal truck to get himself lunch, which he had in the truck as he was leaving. Hodge stated he was probably going to eat it at the shop where he would have had lunch before he took any assignment. He repeatedly stated he did not remember the details.

February 20,1996 Deposition of Hodge

On that date, Hodge stated he was employed by Lee’s Electric and resided in a trailer park owned by Piercy. His salary was $500 per week. Hodge stated he had quit Lee’s Electric at the time the accident occurred and had since been reemployed. At the time of his previous deposition, he did not recall the date he left his employment. After the deposition, Hodge stated he went to Nora Bullock, a Lee’s Electric employee, who looked up the information. Hodge thought she told him he had quit in September 1994, but acknowledged it could have been in August. Hodge continued to live in the trailer park and returned to employment |gwith Lee’s Electric in July 1995. When asked if he performed jobs for Piercy in the interim from before the accident until he returned to work in July 1995, Hodge stated, “No, not really. I don’t think B I don’t know. I don’t remember, you know.” Hodge explained that he really did not remember when he had quit Lee’s Electric at the time of his first deposition, but knew it had been sometime around the accident. Therefore, he had Nora check the date he quit.
Around the time of the accident, Hodge stated he still went to the shop to drink coffee, but that he did not drive a Lee’s Electric truck during that period. He explained what he meant by working 24 hours a day by stating that he was in bed asleep but answered the phone. Once he quit, he no longer answered the phone for Lee’s Electric, but resumed answering the phone when he returned to his employment. During the period he was not employed with Lee’s Electric, Hodge stated he worked for periods driving a truck for a company in Port Allen and a company in Monroe.

September 29, 1997 Deposition of Hodge

During the period of time between his employments with Lee’s Electric, Hodge worked for Safeway Transportation about two weeks driving a truck. For a couple of months, he owned a bobtail truck and *570 was self-employed hauling waste from oil derricks and service stations. Hodge also performed some odd jobs at Piercy’s trailer park or on Piercy’s cars.
When shown a group of credit tickets signed by Hodge for Lee’s Electric for the period of time Hodge stated he was not a Lee’s Electric employee, Hodge said he did not recall those, but he probably signed them for things he needed at the trailer park or for car parts. Hodge stated he did not work for Lee’s Electric, but was paid cash for the odd jobs. Hodge acknowledged signing “Diddle” on some tickets but denied signing others. One of the tickets was for a blue GMC |4Lee’s Electric truck. Hodge explained that he was probably visiting in the gas station and signed the ticket for another Lee’s Electric employee to save that employee time. One $300 ticket was a loan from Piercy to Hodge. Although he did not specifically recall, Hodge said that he was probably filling his personal vehicle with gas on some of the tickets.

Trial Testimony of Hodge

Hodge testified that Lee’s Electric, his employer, did industrial electrical work primarily on cotton gins. He assisted Pi-ercy in electrical work. He also performed maintenance at the trailer park owned by Piercy and worked in the shop, made deliveries and ran errands. He was paid $500 per week by Lee’s Electric. Again stating he was not employed by Lee’s Electric on the date of the accident, Hodge stated he thought he had quit in September, but the payroll records indicated he had left in August because he got aggravated.
At the first deposition, Hodge said he did not recall exactly when he had quit and afterwards he asked Lee’s Electric employee, Nora Bullock, to find out the exact date. Hodge denied changing his story about his employment on the date of the accident based upon subsequent conversations with Piercy. During the period in which Hodge was not employed by Lee’s Electric, Hodge said he drove a truck in Baton Rouge for a couple of weeks, drove a truck in Monroe and bought a truck to haul oil field waste.
On a February 1995 employment application, Hodge admitted stating he was still employed by Lee’s Electric but explained he thought it was easier to get a job if a person already had a job, as opposed to being out of work for a long period. From the time he quit Lee’s Electric until February 1995, Hodge did odd jobs, primarily as a mechanic on cars belonging to Piercy and others for which he was paid cash. Hodge denied that any of the work in that period was for Lee’s | ¡¡Electric. Acknowledging that Piercy paid him cash at times, Hodge initially denied receiving cash from him in the fall of 1994, but acknowledged he had stated at the third deposition that Piercy paid him cash or credit on debts when Hodge did some work for Piercy. Hodge stated he had difficulty remembering the details of the accident and of the previous depositions.
Hodge repeated that the credit tickets to Lee’s Electric signed by him during the period he was not a Lee’s Electric employee were for personal purchases for which he repaid Piercy, items for odd jobs performed for Piercy and, on some occasions, tickets signed for Lee’s Electric employees who came in for gas while Hodge was visiting inside the gas station. Hodge maintained that he was paid by check while he was a Lee’s Electric employee, that he received cash from Piercy for odd jobs for Piercy personally during the period he was not a Lee’s Electric employee and that he did no odd jobs for Lee’s Electric during that period. At the time of the accident, he was obtaining his own lunch and was performing no service for Lee’s Electric.

Testimony of Piercy

According to Piercy, he was an electrical contractor doing business as Lee’s Electric who primarily worked on cotton gins. Pi-ercy also owned Green Acres Trailer Park on which he collected rents and paid ex *571 penses for the upkeep of the property. According to Piercy, Hodge’s present duties as a Lee’s Electric employee were to act as a helper on electrical jobs to assist Piercy, do maintenance at the trailer park and run errands for Piercy. In addition, Hodge served as a mechanic for Percy’s vehicles. The Lee’s Electric telephone was removed from Hodge’s trailer when Hodge quit in 1994. The phone was possibly placed back in Hodge’s trailer for a month when Hodge was rehired, but Piercy then obtained an answering service to handle calls for Lee’s Electric. Except for the phone, |fiHodge’s duties before he quit in 1994 and after he was rehired in 1995 were basically the same. Hodge has always been paid by Lee’s Electric or by Piercy personally for his labor.
When Hodge quit Lee’s Electric, he performed no work for that business, but did mechanic work and odd jobs because Hodge and Piercy were friends. Hodge performed no work for Lee’s Electric around the time of this accident. Although Piercy stated in his deposition that Hodge and everyone were “more or less” on 24-hour call because it was a service oriented business, at trial Piercy testified that “more or less” never meant 24 hours. Piercy testified at trial that he remembered in 1994 when Hodge was not employed by Lee’s Electric. He explained that his statement at his deposition that he was relying on employment records referred to the date that Hodge quit Lee’s Electric. Piercy maintained that he was reasonably sure that Hodge performed no labor for Lee’s Electric in the fall of 1994. Piercy acknowledged paying him cash to obtain parts or do odd jobs in fall of 1994 and admitted an earlier deposition statement to the contrary was a mistake.
Concerning the tickets signed during the period of Hodge’s unemployment, Piercy explained that he got over being angry with Hodge a couple of days after he quit. Piercy let Hodge and other former employees sign credit tickets on Lee’s Electric. He also stated some of his employees signed “Diddle” as a joke after Hodge quit. He also confirmed Hodge’s testimony that Hodge signed some tickets for Lee’s Electric employees when he happened to be in a store where they made purchases.
Piercy stated that Lee’s Electric made no cash payments to anyone and that any work Hodge performed for Lee’s Electric was compensated with a Lee’s |7Electric check. Any cash payments to Hodge during the fall of 1994 would have been for work unrelated to Lee’s Electric.

Testimony of Bullock

The secretary for Lee’s Electric, Nora Bullock, testified that she kept the books, handled charges, paid the bills, dispatched the men, computed quarterly federal employee taxes and did the payroll. From her unstamped copies of IRS forms, she testified that Lee’s Electric paid Hodge $2,800 in the third quarter of 1994 and nothing in the fourth quarter of 1994. She testified that both quarterly payments had been made to the IRS prior to the filing of this suit. Bullock confirmed that Piercy let Hodge and others who were not Lee’s Electric employees sign charge tickets to the business. At the end of each month, Bullock tallied what those persons owed and informed Piercy who collected the debt. Bullock corroborated that on occasion other Lee’s Electric employee’s signed Diddle’s name to charge tickets as a joke. On cross examination, Bullock stated that, although there was never a time when Hodge was not around, she relied upon her memory and the business records to state that Hodge was not employed by Lee’s Electric in the fall of 1994.

REASONS FOR JUDGMENT

Hodge’s Employment Status

The trial court concluded that Hodge was not an employee of Lee’s Electric on October 3,1994 notwithstanding (1) an employment application signed by Hodge four months after the accident in which Hodge stated he was employed by Lee’s Electric, (2) Hodge’s first deposition in September *572 1995, at which he stated he was an employee of Lee’s Electric at the time of the accident, (3) credit tickets made out to Lee’s Electric and signed by Hodge in October, November and December 1994, and (4) inconsistencies in trial and deposition testimony of [8Hodge and Piercy. The trial court found that the testimony of Hodge, Piercy and Nora Bullock, an employee of Lee’s Electric, was basically credible. Predicated on this testimony and the company records, the trial court found that Hodge was a Lee’s Electric employee from 1990 through late August 1994 (a little over a month before the accident) and again in July 1995.
As explanation of the employment application four months after the accident in which Hodge stated he was an employee of Lee’s Electric, Hodge stated he had falsified the application to make himself look good as if he had continuous employment. While noting the action was improper, the court accepted the explanation as understandable and believed Hodge falsified the application for that reason.
Hodge’s' statement at his first deposition almost a year after the accident that he was a Lee’s employee on the date of the accident was a mistake. Both Hodge and Bullock testified that Hodge checked with Bullock after the deposition about the date he had left his employment. Hodge had quit the month before. Based on its observations of Hodge and his testimony, the trial court believed that Hodge was mistaken at the first deposition.
The credit tickets Hodge signed during the pertinent time period did not make Hodge an employee of Lee’s Electric. While some may have been for gas for Hodge’s personal vehicle, Hodge was expected to reimburse Piercy. Others were for gas or parts for Hodge to use mowing Piercy’s trailer park or working on Pier-cy’s vehicles. While Piercy may have compensated Hodge with cash or with writing off Hodge’s debts to him, those actions alone did not make Hodge an employee of Lee’s Electric in the opinion of the trial court.
Even though contradictions certainly existed, the trial court did not find supporting evidence that Hodge was an employee of Lee’s Electric. The trial | ¡,court relied heavily on the testimony of Nora Bullock and the employment records of Lee’s Electric in determining plaintiffs did not meet their burden of proving that Hodge was a Lee’s Electric employee when the accident occurred on October 3, 1994.

Course and Scope of Employment

The trial court observed that even if Hodge were found to have been a Lee’s Electric employee, Hodge was not in the course and scope of any employment when the mishap occurred. In addition to driving his personal vehicle, Hodge was not on any work-related mission for Lee’s Electric. His purpose in going to Pilot to obtain lunch was purely personal.

DISCUSSION

Contending that the trial court erred, the Raglands argued that the credit tickets Hodge signed to Lee’s Electric in the fall of 1994, the employment application Hodge made in February 1995, and Hodge’s statements at his first deposition are sufficient proof that Hodge was employed by Lee’s Electric and in the course and scope of that employment when he struck Mr. Ragland. In their view, Hodge’s only truthful account occurred at his first depositions and that his contradictory statements destroyed his credibility. Further, Hodge, Piercy and Bullock all lied to prevent Lee’s Electric and its insurer from being found vicariously hable for Hodge’s negligence. Because the testimony of all these witnesses was extraordinarily inconsistent and patently unbelievable, the plaintiffs argued the trial court was manifestly erroneous and clearly wrong to have found them truthful.
In Rosell v. ESCO, 549 So.2d 840, 844-845 (La.1989), the supreme court discussed the well-settled rule that a court of *573 appeal may not set aside a trial court’s finding of fact in the absence of “manifest error” or unless it is “clearly hnwrong.” If there is conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel that its own- evaluations and inferences are as reasonable. If the trial court findings are reasonable after its review of the entire record, the court of appeal may not reverse even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently. Where there are two permissible views of the evidence, the fact finder’s choice between them cannot be manifestly erroneous or clearly wrong. In applying the manifestly erroneous— clearly wrong standard to the findings below, appellate courts must constantly have in mind that their initial review function is not to decide factual issues de novo.
When findings are based on determinations regarding the credibility of witnesses, the manifest error — clearly wrong standard demands great deference to the trier of fact’s findings; for only the fact finder can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener’s understanding and belief in what is said. Where documents or objective evidence so contradict the witness’s story, or the story itself is so internally inconsistent or implausible on its face, that a reasonable fact finder would not credit the witness’s story, the court of appeal may well find manifest error or clear wrongness even in a finding purportedly based upon a credibility determination. But where such factors are not present, and a fact finder’s finding is based on its decision to credit the testimony of one of two or more witnesses, that finding can virtually never be manifestly erroneous or clearly wrong. Rosell, supra.
An employer is answerable for the damage occasioned by his servant in the exercise of the functions in which the servant is employed. La. C.C. art. 2320. An employer’s vicarious liability for his employee’s conduct extends only 'to the In employee’s tortious conduct which is within the course and scope of employment. Generally speaking, an employee’s conduct is within the course and scope of his employment if the conduct is of the kind that he is employed to perform, occurs substantially within the authorized limits of time and space, and is activated at least in part by a purpose to serve the employer. An employer is responsible for his employee’s negligence when the conduct is so closely connected in time, place, and causation to the employment duties of the employee that it constitutes a risk of harm attributable to the employer’s business. Several factors influence whether the employee’s conduct is employment-rooted: the payment of wages by the employer, the employer’s power of control, the employee’s duty to perform the particular act, the time place and purpose of the act in relation to service of the employer, the relationship between the employee’s act and the employer’s business, the benefits received by the employer from the act, the motivation of the employee for performing the act, and the reasonable expectation of the employer that the employee would perform the act. Orgeron v. McDonald, 93-1353 (La.7/5/94), 639 So.2d 224, 226-227.
While there were inconsistencies in the testimony and the relationship between Hodge and Piercy was admittedly unusual, our examination of the entire record available for our review, including the testimony and documentary evidence, reveals that the learned trial court was not manifestly erroneous or clearly wrong in finding the witnesses’ explanations of Hodge’s relationship to Lee’s Electric truthful and reasonably concluding that Hodge was neither an employee of Lee’s Electric nor in the course and scope of employment at the time this unfortunate mishap occurred. The trial judge had the opportunity to observe the demeanor of the witnesses and hear the variations in *574 their tones of voice. The witnesses’ account that Hodge quit Lee’s Electric several weeks prior to this | ^accident was supported by the Lee’s Electric payroll and tax records presented at trial. Even if this court might have weighed the totality of the evidence differently, the trial court’s evaluations and inferences are entitled to great deference. This court will not disturb those findings which were based upon reasonable credibility determinations.

DECREE

For the foregoing reasons, the judgment of the trial court is affirmed at plaintiffs’ costs.
AFFIRMED.