768 So.2d 774 (2000)
Kathleen SHIELDS, Plaintiff-Appellee,
v.
GNB TECHNOLOGIES, INC., Defendant-Appellant.
No. 33,911-WCA.
Court of Appeal of Louisiana, Second Circuit.
October 4, 2000.
*776 William T. Allison, Shreveport, Counsel for Appellee.
Lunn, Irion, Salley, Carlisle & Gardner by Walter S. Salley, Shreveport, Counsel for Appellant.
Before WILLIAMS, PEATROSS, DREW, JJ.
DREW, J.
From a judgment in favor of the worker's compensation claimant, Kathleen Shields, the employer, G.N.B. Technologies, Inc. (GNB), appealed a judgment awarding the claimant penalties and attorney's fees along with the right to be examined by an orthopedist. Claimant answered the appeal and sought an increase in attorney's fees. For the following reasons, we amend and affirm.

FACTS AND PROCEDURAL BACKGROUND
The claimant began her employment with GNB, a battery manufacturer, in 1990. After a few months she became a line worker, a position she held until her condition caused her to leave work in January 1997 for surgery for carpal tunnel syndrome. After returning to her employment in March 1998, she worked as a janitor. The parties agreed that Shields suffered from carpal tunnel syndrome for which she had received treatment. At issue is the claimant's entitlement to have her employer pay for an examination by an orthopedic specialist for her shoulder, neck and elbow pain. After her employer refused to authorize her visit to an orthopedist, Shields filed a disputed compensation form in June 1998 seeking additional medical treatment along with penalties and attorney's fees.

Testimony and Evidence
Shields testified she worked as a line worker (tech-mak) in the COS (cast on strap) area where she loaded handfuls of lead plates weighing approximately 5 to 7 pounds onto a machine about five times a minutes for installation of a strap. She also worked on the other side of the machine where she removed (approximately 20 times a minute) smaller, lighter bundles of lead plates and placed the bundles into battery cases.
The claimant testified that in 1996 she began experiencing physical problems which she attributed to the activities of her job. The first severe problem was that her right hand became and remained swollen. Shields reported the complaint to two superiors and to the plant nurse, Vicky Tingler in August 1996. She also reported it to her supervisor when he returned after being off work.
On November 1, 1996, Shields first saw the plant doctor, Dr. Dennie, who recommended nerve conduction studies. Dr. Dennie's records show that the claimant *777 complained of wrist and hand pain going up her forearm. One of the tests performed revealed numbness and tingling going up both arms to the elbows. In the report of Shields' December 3, 1996 visit to Dr. Dennie is the statement that the treatment plan was for Shields to be "referred directly to Dr. Stephen Ramey" for evaluations and treatment.
At the time of claimant's November 18, 1996 visit to Dr. Eric Bicknell for electrodiagnostic tests, Shields testified the pain in her arms had become severe. Dr. Bicknell's records state that Shields reported, in addition to her hand and wrist symptoms, "at times, burning sensations of the entire right hand and forearm up to the elbow. She does note some occasional intermittent neck and shoulder aching." Diagrams from that visit reflect complaints of "stabbing" pains in the shoulders and "ache" in the neck. His tests revealed carpal tunnel syndrome and "no electrodiagnostic evidence of ulnar neuropathy, brachioplexopathy, or cervical radiculopathy on either side."
The claimant testified that Dr. Dennie informed her that her condition required treatment by a specialist and on Tingler's recommendation, Shields saw Dr. Ramey. At her first visit to Dr. Ramey on December 10, 1996, Shields stated on her patient information form that Dr. Dennie referred her to Dr. Ramey. Dr. Ramey confirmed the carpal tunnel diagnosis and recommended conservative treatment while the claimant continued to work. Dr. Ramey's initial consultation report, dated December 13, 1996, makes no mention of complaints of elbow, shoulder or neck pain. However, several checklists in the record, beginning with a report hand-dated on December 10, 1996, reflect complaints of painful shoulders and painful elbows.
In January 1997 her condition was such that she stopped work and Dr. Ramey began the process to schedule surgery. The certification process continued until surgery was performed in April and May of 1997 on both wrists. Dr. Ramey's correspondence in the record stated that Shields made good progress after the surgery. In June and September 1997, Dr. Ramey reported that claimant could return to some type of non-repetitive work.
In a diagram dated October 13, 1997, made at Dr. Ramey's office, Shields reported complaints of aches in her upper arms and shoulders and burning pains in her elbows. These complaints are not reflected in Dr. Ramey's progress reports until December 9, 1997 when he stated that Shields complained of right shoulder and neck pain; no mention is made of elbow pain. On that date, Dr. Ramey recommended that Shields' shoulder and neck symptoms be evaluated by an orthopedist. Another evaluation from Dr. Ramey, on January 19, 1998, reflects "continuing" complaints of shoulder and elbow pain, and Dr. Ramey repeated his recommendation for an orthopedic evaluation of the pain. Shields testified that Dr. Ramey's referral was for evaluation of sharp pains through her elbows running up her arms into her shoulders and upper back which began a couple of weeks after she injured her hand and reported it to Tingler in August 1996.
Shields saw Dr. Theresa Rinderle, her primary care physician, in April and June of 1998 for the problems with her arms, shoulders and neck. Dr. Rinderle's April 1998 record stated:
[Patient reports] a chronic problem she has been having with the bilateral upper extremities. She reports that in August of 1996 while a production worker lifting lead slates weighing approximately three to five pounds apiece, she began to have problems with carpal tunnel symptoms. She had nerve conduction studies done in October of 1996 confirming symptoms, but was not allowed to get off work until January of 1997. She had been placed temporarily on light duty but when her work failed to recognize light duty, she worked full duty until she could get medical leave. She had a carpal tunnel release in April of *778 1997 and June of 1997 on the left hand by Dr. Ramey. She had been unemployed and not working until March 30, 1998, when she was cleared as far as the carpal tunnel and asked to return to full duty. However, she reports that during this time she had other symptoms that existed involving pain in the right forearm at the extensor muscle groups and the right upper arm in the triceps muscle groups, occasionally radiating into the shoulders and neck. Nothing was ever addressed regarding this and the surgery, which did help her carpal tunnel syndrome symptoms, has not improved these areas. Upon her return to full duty, she is working in a janitorial capacity and upon lifting just some cardboard yesterday, she felt a stinging, sharp sensation in the left fifth digit and thumb radiating all the way into the neck. According to the patient, no other studies have been done and she has never been through physical therapy. Specifically, her discomfort is what she reports as a dull, persistent ache that occasionally becomes a burning that she can relieve by flexing her arms in a posture across her chest and sometimes massaging. She also experiences a pain in the medial scapular region as well.
Shields testified that she discussed seeing an orthopedic specialist with Dr. Rinderle, who sent her for an MRI in June 1998. According to Shields, the MRI came back negative and Dr. Rinderle refused to refer Shields for an orthopedic examination.
On cross-examination, Shields affirmed that she did not have a specific accident but had performed the same job for five or six years when her hand began hurting and swelling. From the time her hands began hurting, GNB did not remove claimant from the machine until January 1997; Shields testified her pain got steadily worse and radiated from her hands further and further up her arms while she continued to work on the machine. Shields acknowledged that Dr. Rinderle had treated her in 1993 for tendinitis for achy arms, shoulders and hands. Shields also complained to Dr. Rinderle of a stiff neck and a possible pinched nerve in her neck in 1993. In 1995 claimant sought treatment for wrist and elbow problems "from lifting heavy things at work." In April 1996 Shields had pulled a muscle in the shoulder blade area of her back for which she received physical therapy. At that time, the doctors stated a possible cause of her difficulty was Shields' poor posture. Shields also stated she consistently complained about her elbow problems even before she went to Dr. Ramey whose referral to the orthopedist was based upon her elbow and shoulder complaints. The claimant also explained that when she referred to neck problems she meant the area running from shoulder to shoulder at the base of her neck.
Shields was off work for surgery and recuperation from January 1997 until March 1998. She testified that her hands got better during that period but the remaining symptoms persisted. In June 1998 Shields also saw a rheumatologist, Dr. Susan Williams, on a referral from Dr. Rinderle. Dr. Williams diagnosed her with arthritis in her knees and myalgia secondary to fibromyalgia, a diagnosis about which Shields was skeptical, since her pain was limited to only certain parts of her body.
According to Shields' testimony, Dr. Rinderle also wanted to refer her to an orthopedist. Shields consented and the doctor's office was to get the referral approved. When she next spoke to the doctor's office, the referral was actually made to the rheumatologist. Shields stated she had hand, shoulder and arm complaints as early as 1993 and these problems culminated with her swelling painful hands in August 1996.
GNB called its plant nurse, Vickie Durr Tingler, who stated she was health and safety coordinator which included any nursing for minor injuries, worker's compensation claims, and referrals to the company doctor. Prior to October 1996 *779 Shields had come in for medication for her hands and wrists. In late October Shields stated she was having tingling and numbness in her hands and fingers and pain in her wrists and forearms which she attributed to her job. Therefore, Tingler made her an appointment with Dr. Dennie, the plant doctor. Tingler denied that Shields had ever complained to her about her elbows or shoulders. Tingler also denied referring Shields to Dr. Ramey. According to Tingler, Shields did not know what doctor to use and Tingler informed her that others at the plant had been pleased with Dr. Ramey. Shields chose to see Dr. Ramey and Tingler set up the appointment. Tingler stated that GNB had never denied Shields an orthopedic evaluation for her wrists and hands.

WCJ's Reasons for Judgment
In oral reasons for judgment, the worker's compensation judge (WCJ) noted claimant's carpal tunnel syndrome for which she had been treated was undisputed but that treatment for her elbow and shoulders was disputed. The claimant related the elbow and shoulder complaints to the carpal tunnel syndrome while GNB did not. The employer urged those complaints arose prior to Shield's occupational disease and refused to pay for an orthopedic examination for Shields' elbows and shoulders. The WCJ cited La. R.S. 23:1203(A) which requires that the employer shall furnish all necessary drugs, supplies, hospital care and services, medical and surgical treatment, and any nonmedical treatment recognized by the laws of this state as legal. Further, the employee has the right to select one treating physician in any field or specialty. La. R.S. 23:1121(B). Recognizing that the claimant and the employee both denied selecting Dr. Ramey who treated Shields' carpal tunnel syndrome, the WCJ stated a resolution was unnecessary. The important factor was that Dr. Ramey had recommended the orthopedic examination. Therefore, the claimant was entitled to be examined by an orthopedist of her own choice at the employer's expense.
Since Dr. Ramey was treating the claimant and recommended that she be examined by an orthopedist, the WCJ found that GNB's refusal to approve the orthopedic examination was arbitrary and capricious and not based upon any evidence to the contrary. Citing La. R.S. 23:1021, the WCJ awarded the maximum $2,000 penalty and attorney's fees of $2,500. GNB appealed the judgment. Claimant answered the appeal and seeks additional attorney's fees.

DISCUSSION

Entitlement to Orthopedic Evaluation
An employee is entitled to compensation benefits if she receives a personal injury by accident arising out of and in the course of her employment. La. R.S. 23:1031(A). Employees who contract occupational diseases are also entitled to compensation benefits. La. R.S. 23:1031.1 provides, in part:
A. Every employee who is disabled because of the contraction of an occupational disease as herein defined, or the dependent of an employee whose death is caused by an occupational disease, as herein defined, shall be entitled to the compensation provided in this Chapter the same as if said employee received personal injury by accident arising out of and in the course of his employment.
B. An occupational disease means only that disease or illness which is due to causes and conditions characteristic of and peculiar to the particular trade, occupation, process, or employment in which the employee is exposed to such disease. Occupational disease shall include injuries due to work-related carpal tunnel syndrome. Degenerative disc disease, spinal stenosis, arthritis of any type, mental illness, and heart-related or perivascular disease are specifically excluded from the classification of an occupational *780 disease for the purpose of this Section.
The causal link between the employee's occupational disease and work-related duties must be established by a reasonable probability. Seal v. Gaylord Container Corp., 97-0688 (La.12/2/97), 704 So.2d 1161. The claimant will fail if he shows only a possibility that the employment caused the disease, or that other causes not related to the employment are just as likely to have caused the disease. Expert testimony is required to support a finding of an occupational disease. Once the employee has established the existence of an occupational disease, for his illness to be compensable, the employee must further establish that the illness is disabling. Crotwell v. Holloway Sportswear, 32,038 (La.App.2d Cir.6/16/99), 740 So.2d 748.
If the employee proves a work-related injury, the employer is required to furnish all necessary drugs, supplies, hospital care and services, medical and surgical treatment, and any nonmedical treatment recognized by the laws of the state as legal for a compensable injury. La. R.S. 23:1203(A). The worker claiming medical benefits must prove by a preponderance of the evidence the necessity and relationship of the treatment to the work-related accident. Chitman v. Davison Trucking, 28,073 (La.App.2d Cir.2/28/96), 669 So.2d 671.
As this court stated in Whittington v. Rimcor, Inc., 601 So.2d 324, 329 (La.App. 2d Cir.1992), writ denied, 605 So.2d 1366 (La.1992):
In order to recover medical expenses under Sec. 1203, the claimant must prove that the expenses are reasonably necessary for treatment of a medical condition caused by the work injury.... The employer is not obligated to pay for medical evaluations undertaken solely for the purpose of obtaining an opinion that does not affect the treatment of a claimant.
. . .
A physician who is treating a w.c. claimant may seek whatever consultations are medically necessary (Sec. 1203 A) to determine the claimant's course of treatment for the effect of the injuries received in the work accident.
Emphasis in original, citations omitted. See also Bailey v. Smelser Oil & Gas, Inc., 620 So.2d 277, 279 (La.1993).
The WCJ's findings are subject to the manifest error rule. Alexander v. Pellerin Marble & Granite, 93-1698 (La.1/14/94), 630 So.2d 706. Only when documents or objective evidence so contradict the witness's story, or that story itself is so internally inconsistent or implausible on its face that a reasonable fact finder would not credit it, may the appellate court find manifest error. Ragland v. Hodge, 32,433 (La.App.2d Cir.12/8/99), 748 So.2d 567.
Shields testified that the pain in her elbow and shoulder began approximately two weeks after the incident when her hand became swollen. Although Shields' medical records indicate complaints of elbow pain before this incident, the records show that Shields attributed those earlier complaints to her work as well and Shields testified that earlier shoulder pain was in a different place than the pain she attributed to the August 1996 event.
The claimant testified that she told her employer about the various shoulder, elbow and neck pains shortly after the incident with her hand. The absence of evidence of these complaints in GNB's records is not fatal to Shields' claim; her testimony is sufficient proof. Taylor v. Columbian Chemicals, 32,411 (La.App.2d Cir.10/27/99), 744 So.2d 704, 708. Further, medical records generally show a consistent pattern of complaints of pain in the elbow, neck and shoulder areas after the August 1996 incident.
*781 From all of the evidence presented we cannot say that the WCJ was manifestly erroneous in finding that an orthopedic evaluation of Shields' neck, elbow and shoulder pain was necessary to further her treatment with Dr. Ramey. Shields' testimony linked the onset of the pain temporally with the most serious of her carpal tunnel syndrome symptoms. Moreover, the ordering of an evaluation is not tantamount to a finding that the shoulder, elbow and neck pain were in fact caused by the work-related injuries; rather, the evaluation is merely calculated to help the doctor prove or dispel a causal link and further the course of treatment. As the court in Bailey, supra at 281, recognized, a compensation case is prematurely tried if the matter is considered prior to completion of reasonable medical examinations, evaluation and treatment of the plaintiff. The determination of whether Shields' shoulder, neck and elbow pain fits the criteria required to prove an occupational disease cannot reasonably be made in the absence of an expert evaluation. Shields has made a sufficient showing that her pain is related to her established occupational disease and she is therefore entitled to further evaluation as a compensation benefit.

Penalties and Attorney Fees
An employer or insurer who fails to commence payment of compensation benefits timely, to pay continued compensation benefits installments timely, or to pay medical benefits timely may be subject to penalties not to exceed $2000 and attorney's fees, unless the claim is reasonably controverted or the nonpayment results from conditions over which the employer and insurer have no control. La. R.S. 23:1201; Williams v. Rush Masonry, Inc., 98-2271 (La.6/29/99), 737 So.2d 41. A claim is reasonably controverted when the employer or insurer produces factual or medical information of such a nature that it reasonably counters the claimant's evidence. Brown v. Texas-LA Cartage, 98-1063 (La.12/1/98), 721 So.2d 885; Nowlin v. Breck Const. Co., 30,622 (La.App.2d Cir.6/24/98), 715 So.2d 112. An employer who discontinues payment of benefits due may be ordered to pay the claimant's attorney's fees, if the discontinuance is arbitrary, capricious, or without probable cause. La. R.S. 23:1201.2; Williams, supra.
In Williams, supra, the court stated:
Since the 1995 amendment, Section 1201 now generally governs the time period for commencing payment of compensation benefits and the timeliness of payment of continued benefits, as well as the time period for paying medical benefits; Section 1201 now also authorizes the award of both penalties and attorney's fees if payment of compensation benefits is not commenced timely, if continued benefits are not paid timely, or if medical benefits are not paid timely, unless "the claim is reasonably controverted" (or the nonpayment results from conditions over which the employer and insurer have no control); and Section 1201.2 now governs the discontinuance of payment of claims due and arising under the Act, with an award of attorney's fees authorized when the discontinuance is arbitrary, capricious or without probable cause, as well as penalties only against the insurer in limited situations.
In summary, both penalties and attorney's fees are now recoverable under Section 1201 F if the employer or insurer fails to commence payments of benefits timely or to pay continued installments timely (or to pay medical benefits timely) unless the claim is reasonably controverted. However, only attorney's fees generally are now recoverable under Section 1201.2 if the employer or insurer arbitrarily discontinues payment of benefits due.

Williams, 737 So.2d at p. 45.
The WCJ has great discretion in determining whether to allow or disallow penalties and attorney's fees and her decision will not be disturbed absent manifest *782 error. Anthony v. BE & K Construction, 32,729 (La.App.2d Cir.5/10/00), 760 So.2d 608.
We reject GNB's argument that the applicable statute in this matter is La. R.S. 23:1201.2 dealing with discontinuance of benefits. In January 1997 and January 1998, when Dr. Ramey sought to refer Shields to an orthopedist, Shields was still off work recuperating from her carpal tunnel syndrome. Shields returned to work in March 1998 after the denial of the requested evaluation and treatment.
An employer must rely on competent medical evidence to deny medical treatment. Harrington v. Coastal Const. & Engineering, 96-681 (La.App. 3rd Cir.12/11/96), 685 So.2d 457, writ denied, 97-0109 (La.3/7/97), 689 So.2d 1375. There is little evidence in the record of the investigation by GNB into Shields' complaints of pain. The company nurse testified that she had reviewed Shields' medical records, but there is no direct explanation for the basis of GNB's refusal to pay for the referral. Particularly, no witness testified that GNB refused to authorize the referral because of the medical opinion of any doctor or because of other related information.
As noted above, Shields's testimony and the medical records adequately linked in time her arm and shoulder problems to the onset of her carpal tunnel syndrome. The causal link between the carpal tunnel and Shields' other complaints has been established to a reasonable probability. Shields acknowledges in brief that a definitive determination has not yet been made that her arm and shoulder problems are work related and part of the carpal tunnel syndrome problems. Shields also notes that the orthopedic evaluation is essential to make this assessment.
The negative MRI in June 1998 and Dr. Rinderle's referral to the rheumatalogist occurred well after Dr. Ramey's referrals to the orthopedist in December 1997 and January 1998. Further, GNB's attempts to rely on Dr. Ramey's February 27, 1998 letter to the insurance case manager stating that it was his "opinion that the symptoms are not related to her carpal tunnel syndrome" is misplaced. Dr. Ramey went on to write:
However, she has stated to me in the past during office visitations, that she did have pain in the elbows and right shoulder region. I had recommended to her as early as December of last year, that she obtain a consultation with an orthopedic surgeon for these symptoms.
GNB's action in refusing to authorize the orthopedic evaluation stymied Shields' efforts to have evaluated the problems which arose at about the same time as her carpal tunnel syndrome and which she consistently reported to her medical care providers. Shields provided medical records which corroborated her own testimony. Taking the record as a whole, GNB's refusal to authorize the orthopedic referral was not reasonably controverted by competent medical evidence. Although the WCJ incorrectly referred to GNB's actions as arbitrary and capricious (the standard under 23:1201.2) in oral reasons, the WCJ also correctly found that the refusal was not based upon contrary evidence; i.e, reasonably controverted by factual or medical information. Appeals are taken from judgments, not reasons for judgment. Dufour v. Horton, 609 So.2d 1109 (La.App. 2d Cir.1992). The WCJ was not manifestly erroneous in the imposition of penalties and attorney fees under La. R.S. 23:1201.
In an answer to the appeal, claimant sought an increase in attorney's fees. We conclude that the claimant is entitled to a $500 increase in attorney fees attributable to the employer's appeal.

CONCLUSION
For the above reasons, the judgment is amended to award an additional $500 in attorney's fees for the appeal and is otherwise *783 affirmed. Costs of this appeal are assessed to GNB
AMENDED AND, AS AMENDED, AFFIRMED.