CARAWAY, J.
 

 |,In this case the medical testimony revealed that the employee suffers from the chronic disease of psoriasis. She brought this workers’ compensation action claiming that her psoriasis is an occupational disease caused by certain chemicals and other skin irritants to which she was exposed during her last two employments. Both employers were initially sued. Yet, during trial, the plaintiff dismissed her last em
 
 *1021
 
 ployer from the action. Judgment was eventually rendered against the previous employer upon the determination that psoriasis was an occupational disease. Finding that the medical testimony does not support the holding that psoriasis is an occupational disease, we reverse.
 

 Facts & Procedural History
 

 Annie L. Carodine
 
 [1]
 
 filed a disputed claim with the Louisiana Office of Workers’ Compensation on March 30, 2005. Carodine claimed an occupational disease arising on September 17, 2004, consisting of “psoriasis/contaet dermatitis from exposure to chemical cleaning agents.” Two employers were listed, Pilgrim’s Pride Corporation (hereafter “Pilgrim’s”) and Louisiana Tech University (hereafter “Tech”).
 

 Carodine was employed at Tech from 1988 through October 2004, as a dormitory custodian. The last day she actually worked was September 17, 2004. Prior to resigning, her attendance reports reflected significant periods of overtime. During the three weeks preceding September 17, 2004, Carodine worked twelve consecutive days, including 24 hours of overtime | .¿over four days and Labor Day, a holiday. She resigned later the following week, citing personal reasons and “moving to another area.” She began her new employment with Pilgrim’s on October 28, 2004.
 

 The Tech records revealed at least two reports of employee “Injury/Illness” for on-the-job incidents in which Carodine was exposed to cleaning products. On January 14, 2002, she “came in contact with cleaning solutions bleach ... cleaning the dorms,” that affected her “arms [and] made a rash.” Carodine was sent to Dr. Boersma and treated on the same day of the exposure. His progress note stated: This lady has a rash. It seems to be on points of her body which might touch against something. She uses bleach in the shower when she is working and it may be that. It is on the outside of her right elbow especially on the outside of her left elbow. I gave her Celestone and Diprolene cream.
 

 Three weeks later, Carodine went to E.A. Conway Hospital Emergency Room again complaining of a rash. The physician noted “pruritic rash has now spread to back/ flanks,” and “patient thinks it is because she got into some bleach.” The February 8, 2002 discharge diagnosis was eczema-tous dermatitis.
 

 On March 24, 2003, Carodine reported “spill[ing] Ring-Away on her hand ... cleaning bathrooms [in the dorm]” affecting her “right hand” with “irritation spread to the left eye.” Dr. Boersma described the second incident of exposure when he examined her on April 3, 2003:
 

 Annie was at work. This was on Monday the 21st which is now nearly two weeks ago. She spilled some stuff on her hand. She said that there (sic) was on the sponge that she was using. She had taken her glove off and shook the sponge and a few drops dropped on her hand. This was ammonia bi fluoride. It also spilled up on her face. She has a puffiness on her cheek |sand some er-ythema but no, real problem. I don’t think it entered her eye exactly. On the right hand on the knuckles of the index and middle fingers, she has areas of burn. The one on the middle finger is larger and it is about 3 cm in length and the other one is about 2 cm. It is oozing serum but not infected. I told her to scrub it with soap and water frequently.
 

 
 *1022
 
 The next day, Carodine returned to E.A. Conway Hospital Emergency Room, complaining of a “sore to right middle and first finger with rash to right arm and face since Monday — spilled chemical on hand at work Monday.” She was treated for contact dermatitis with a secondary infection and released. After the condition worsened three days later, Carodine went back to the hospital where she was again diagnosed with contact dermatitis, both hands and infected lesion, right hand. Oral corticosteroids were prescribed, she was instructed to use thick gloves while working and referred to the LSUHSC Dermatology Clinic in Shreveport.
 

 On May 5, 2003, Carodine went to both the hospital emergency room and Dr. Boersma for problems with her right hand and right arm. The physician noted her “history of exposure to noxious chemical with chemical (sic) dermatitis” and diagnosed eczematous rash, right dorsal hand, wrist, forearm and elbow. When Dr. Boersma examined her, he noted:
 

 This lady once again has a rash on the dorsum of her right hand and up on the arm. There are streaks on her forearm that suggests stronger that she has liquid on her hands and it is running down towards her elbow. She said that she does wear rubber gloves. They issue her thin rubber gloves and she has obtained some thicker ones to use. However they are not her size. I think it is contact with chemicals and I gave her Diprolene to use once a day and I instructed her in better glove care. I will see her again in a week.
 

 On October 26, 2004, after Carodine’s employment with Tech ended and immediately before she began new employment with Pilgrim’s, |4Carodine’s medical records show that she went to the emergency room complaining of a rash on her arms and legs related to contact with Pine-Sol in the bathtub. She also reported constantly itching from insect bites. After examination and treatment, she was diagnosed with contact dermatitis and infected insect bites of the right calf and thigh.
 

 After leaving Tech, Carodine submitted her Pilgrim’s employment application on October 19, 2004. The application stated her reason for leaving Tech was “because of the chemicals.” When Pilgrim’s hired her, the paperwork included acknowledgment and/or receipt of general training covering certain chemicals involved with the Pilgrim’s workplace. The poultry processing work consisted of pulling chicken tenders on the small bird line. Carodine began work on October 28 and her last day was November 17, 2004. She had numerous absences throughout. Pilgrim’s wrote Carodine a letter dated November 19, notifying her that documentation was required to substantiate any absence longer than three days. On November 30, Pilgrim’s terminated Carodine’s employment due to “excessive absences during probation.” Carodine had worked for a total of fifteen days, 4½ of which were sick days.
 

 Carodine began treatment with a Monroe dermatologist, Dr. David Walsworth, on November 2, 2004, when she presented with a rash on her arms, face, stomach, legs and hands. The patient history sheet stated, “pustules didn’t start until started work at Pilgrams (sic) Pride-some rash before then....” Over the course of her treatment during that month, Dr. Wals-worth took a tissue biopsy of Carodine’s left arm and right palm. The | .¡pathology report for the tissue biopsy found psoriasi-form dermatitis with scale crusts, and contained the following comment:
 

 The degree of inflammation and the almost pustular nature of the inflammation in [skin, left arm] and [skin, right palm] also suggest the possibility of pustular psoriasis. The presence of spon-
 
 *1023
 
 giosis and relatively straight dermal vessels is more consistent with allergic contact or nummular dermatitis. Clinical correlation is required.
 

 On November 29, Dr. Walsworth referred Carodine to Dr. David Clemons, a Shreveport dermatologist, and an appointment was scheduled for the next day.
 

 Dr. Clemons diagnosed generalized psoriasis on November 30, 2004. The patient history stated:
 

 She started working at Pilgrim Pride chicken plant (Oct 28, 2004); she works in chicken processor pulling “tenders;” hands are in gloves but she still gets product on there. This work experience triggered the psoriasis. She had normal skin before starting work. She worked at La Tech in housekeeper x 16 years— she went to E.A. Conway Hospital for rashes on hands & elbows — she would clear after a cortisone shot
 
 &
 
 cream. This hand cleared. Chemicals kept breaking her out. Dr. Walsworth gave shot of cortisone. With this severe psoriasis body & hands she will not be able to work in first processing at the chicken plant.
 

 Dr. Clemons also wrote Dr. Walsworth, advising that Carodine should obtain some vocational rehabilitation or disability benefits, “with the condition of her hands she will not be able to do manual labor, housekeeping work, or work in the chicken plant.”
 

 In her amended 1008 Claim Form filed August 17, 2005, Carodine listed the two employers, Pilgrim’s and Tech, as defendants. The date of the injury/illness was “09-17-04” and the injury was described as an “occupational disease.” Carodine’s occupation was listed as | (¡“custodian/assembly line.” She claimed exposure at Tech with “certain chemical cleaning agents,” from which she developed “contact dermatitis/psoriasis.” According to the amended petition, when Carodine’s employment with Tech terminated, working at Pilgrim’s exposed her to “certain water and product,” and she redeveloped “contact dermatitis/psoriasis.” The petition alleged that contact dermatitis/psoriasis was an occupational disease, both employers had contributed to the disability, and thus solidary liability existed for benefits, medical expenses, penalties and attorney’s fees. The accidenVinjury portion of the 1008 Form stated an “occupational disease” involving “psoriasis/contact dermatitis from exposure to chemical cleaning agents.”
 

 The trial occurred in June 2006. Following certain stipulations and testimony concerning Carodine’s employment at Tech and Pilgrim’s, Carodine testified regarding her employment duties at Tech and the medical treatment for her rashes by Dr. Boersma. She testified that after leaving Tech, but before employment with Pilgrim’s, she thought her medical condition improved. After Pilgrim’s hired her, she pulled chicken tenders on the production line. Before lunch breaks and morning and afternoon breaks, the employees were cleaned off by a water hose being sprayed on them.
 

 On cross-examination, Carodine confirmed that Pilgrim’s provided an inner cotton and outer vinyl glove, an elasticized sleeve, vinyl apron and outer smock as protective gear, in addition to rubber boots, a hair net and ear plugs. The boots came over the calf to below the knee. Carodine [ .¡reiterated that “the only moisture that ever got on [her] may have been on [her] pants leg.” After a strenuous cross-examination, during which Pilgrim’s counsel used Carodine’s deposition to impeach her direct testimony suggesting that her line work aggravated her skin problems, the trial court recessed for lunch prior to redirect examination.
 

 
 *1024
 
 Thereafter, Carodine’s counsel moved to dismiss the claim against Pilgrim’s with prejudice. The following discussion ensued:
 

 MR. CALHOUN [Tech’s counsel]: I believe that the state of law — he’s saying with prejudice, will indicate that if there is solidary liability between two parties for a — for an occupational injury, then the most recent party can bear that liability. He said “with prejudice,” but I believe that’s the law.
 

 MR. DUHE: That is the law.
 

 MR. CALHOUN: So if she wants to dis — to allow him to dismiss with prejudice, then she will be saying that he cannot pay her, and he may be — according to what the law says, the person who is liable. But I just want to make sure she does that with full knowledge that that’s—
 

 MR. CALDWELL: Your Honor, I don’t think it’s required any more by statute, but just in case it is or there’s any question, the dismissal will be, of course, that we’re reserving our rights against Louisiana Tech University.
 

 MR. CALHOUN: And Your Honor, I don’t think he can-his dismissal of anything he does can prejudice our rights to go against Pilgrim’s Pride in accordance with the law.
 

 THE COURT: That’s right. That part is true. Okay, so you’ve moved for a dismissal with prejudice. Right?
 

 MR. CALDWELL: That’s correct, Your Honor.
 

 THE COURT: All right. So what I’m going to do, I’m going to grant the dismissal with prejudice. However, Louisiana Tech would certainly have a right to proceed against Pilgrim’s Pride if it were found that there is some liability involved from them. Okay?
 

 The trial continued thereafter without Pilgrim’s as a party. At one point in her testimony, Carodine acknowledged that the rash was not present while she was between employments, stated the sanitizing water at Pilgrim’s contained bleach, and agreed that the photographs of her condition were |staken after she was no longer employed at Tech. At this point, Carodine’s counsel objected on the grounds of relevancy:
 

 MR. CALDWELL: Your Honor, at this point, I have to ask the relevancy since Pilgrim’s Pride is no longer a party to the suit, how that may fit into the claim against Louisiana Tech?
 

 THE COURT: I’ll allow you to respond.
 

 MR. CALHOUN: Your Honor, the issue here is was her injury caused by Louisiana Tech or not. If there is another cause of her injury, that’s certainly relevant. Not only that, the lawsuit, he’s dismissed it here during the course of trial. He filed a suit against Louisiana Tech — I mean, against Pilgrim’s Pride alleging that they caused an injury and dismissed it during the course of trial. Now, had he dismissed it even the day before the trial, we would have been able to bring some sort of reconventional demand or some sort of affirmative action. We cannot do it today. But the issue is what caused her injury. Any evidence relevant to some other cause should be admissible and relevant.
 

 THE COURT: I agree. Overruled.
 

 Finally, on redirect, Carodine’s counsel asked her to explain the term “outbreak”:
 

 Q ... What does outbreak mean to you?
 

 A Well, I’m diagnosed with psoriasis—
 

 Q Okay.
 

 A — of the skin.
 

 
 *1025
 
 Q All right. Well, when you say “outbreak,” what do you mean by that?
 

 A Just like right now, like I’m breaking out right now.
 

 Q All right. What is a rash? What do you mean by a rash, the term rash?
 

 A Turning red and skin pealing (sic) and swelling and—
 

 Q Is that the same as an outbreak?
 

 A Yes.
 

 The trial concluded and the workers’ compensation judge (“WCJ”) took the matter under advisement. On August 24, 2006, the WCJ ruled from the bench, finding that “claimant suffers from an occupational disease which was either caused or aggravated by her work at both Louisiana Tech University and Pilgrim’s Pride Corporation.” Carodine was awarded Judgment against Tech for temporary total disability benefits from November 30, 2004, based on the salary she earned at Tech ($622.40 every two weeks), together with vocational rehabilitation, and payment of all medical treatment related to an occupational disease. The WCJ also awarded $2,000 in penalties and $8,000 in attorney’s fees.
 

 Regarding Pilgrim’s dismissal from the suit, the WCJ reasoned:
 

 ... [Claimant dismissed her claim against Pilgrim’s Pride. However this Court was still presented with evidence demonstrating their contribution to claimant’s condition. This Court cannot simply ignore that evidence. While this Court cannot render judgment against Pilgrim’s Pride due to the dismissal, I still find them to be a contributor to claimant’s condition while she was employed with them. Nevertheless, under the facts and circumstances presented, Louisiana Tech University shall pay all temporary total disability benefits, medical expenses and penalties and attorney fees.
 

 Tech appeals, challenging the existence of an occupational disease and asserting Pilgrim’s responsibility as the last employer where the injury occurred.
 

 Discussion
 

 An employee is entitled to compensation benefits if she l’eceives an injury by accident “arising out of and in the course of her employment.” La. R.S. 23:1031(A). Additionally, the entitlement to workers’ compensation benefits may result from an occupational disease, which is defined in La. R.S. 23:1031.1(B) as follows:
 

 An occupational disease means only that disease or illness which is due to causes and conditions characteristic of and peculiar to the particular trade, occupation, process, or employment in which the employee is exposed to such disease.
 

 [inA claimant asserting an occupational disease must prove by a preponderance of the evidence that she suffers a disability which is related to the employment-related disease, that she contracted the disease during the scope of her employment and that the disease is a result of the work performed. La. R.S. 23:1031.1(A);
 
 Gosey v. General Motors Corp.,
 
 36,695 (La.App. 2d Cir.3/5/03), 839 So.2d 1003,
 
 citing Billington v. General Motors Corp.,
 
 31,585 (La.App. 2d Cir.2/24/99), 728 So.2d 966. The causal link between the employee’s occupational disease and the work-related duties must be established by a reasonable probability.
 
 Shields v. GNB Tech., Inc.,
 
 33,911 (La. App. 2d Cir.10/4/00), 768 So.2d 774,
 
 citing Seal v. Gaylord Container Corp.,
 
 97-0688 (La.12/2/97), 704 So.2d 1161. Expert testimony is required to support a finding of an occupational disease.
 
 Shields v. GNB Tech., Inc., supra.
 

 
 *1026
 
 In
 
 Hymes v. Monroe Mack Sales,
 
 28,768 (La.App. 2d Cir.10/30/96), 682 So.2d 871, the court explained:
 

 The expression “characteristic of and peculiar to,” as used in § 1031.1 B [of the Workers’ Compensation Law], does not mean that the disease occurs only in persons engaged in the particular employment and not otherwise found among the general public. Rather, it means that the disease must result from the conditions and causes present in the employment and not from other causes to which the claimant and everyone else might have been exposed. Stated otherwise, it means that the disease must originate from conditions in the employment that result in a hazard that distinguishes the employment in character from the general run of occupations. (Internal citations omitted.)
 

 Id.,
 
 682 So.2d at 876.
 

 Snowden v. Oak Manor Motor Hotel Co.,
 
 219 So.2d 288 (La.App. 1st Cir.1969) addressed the claim of an occupational disease involving an |nemployee with psoriasis. The court held that claimant’s psoriasis was not an occupational disease, but “resulted from a congenital condition ... and therefore cannot be said to have come about as a result of the nature of the work performed.... ”
 

 The only testimony in this case presented by a physician was the deposition of Dr. Clemons. During Carodine’s treatment with Dr. Boersma in 2002 and 2003, she was diagnosed with contact dermatitis. During Dr. Walsworth’s treatment in November 2004, he first noted the possibility of psoriasis and referred Carodine to Dr. Clemons for a second opinion. Significantly, from Dr. Clemons’s testimony, he was not familiar with Carodine’s medical records for the two incidents at Tech involving cleaning chemicals which resulted in Dr. Boersma’s treatment. Dr. Clemons’s opinion was related to Carodine’s work at Pilgrim’s.
 

 Dr. Clemons’s deposition explained that pustular psoriasis is a more severe form of psoriasis. In his opinion, Carodine suffered from “severe psoriasis involving her body and hands of such a severity that I felt it was disabling to her and I didn’t think she could work in her current job [at Pilgrim’s] with her hands in the condition that they were in.”
 

 Dr. Clemons described psoriasis as a condition that can affect one or two percent of the population. He gave a description of “a condition where you have islands of abnormal skin right up adjacent to normal skin.” He stated:
 

 People can have psoriasis and they can just have it. It’s sort of — it’s genetically predisposed, okay.
 

 | iaAnd there are a lot of external triggering factors for psoriasis which can include medications. They can include infection like a strep throat, yeast infections. And most of the triggering factors are unknown and we don’t even know what they are, okay.
 

 So in general it’s a condition of unknown cause. We understand immunologic and genetic mechanisms, but every little thing that brings it out we don’t completely understand.
 

 Other aggravating irritants for the person with psoriasis were identified by Dr. Clemons as chemicals, soaps, excessive moisture, and the so-called Koebner phenomenon related to ordinary skin trauma. Dr. Clemons stated “if conditions like psoriasis are active and you have a skin injury like a cut, then you’ll get psoriasis in those areas.”
 

 Finally, when asked if the psoriasis was caused by a systemic problem, Dr. Clemons responded:
 

 
 *1027
 
 Yes. But the systemic problem is a genetic predisposition that triggers your white corpuscles called lymphocytes to travel to the skin and inflame it. So it’s systemic in that respect triggered by— things that make something worse are called antigens. And all the things that trigger these white corpuscles to go to the skin and inflame it are unknown.
 

 [[Image here]]
 

 It’s chronic. I’ve had patients that have gone into long-term remissions. But in general they will need some medical therapy periodically for most of their life.
 

 From consideration of Dr. Clemons’s deposition in its entirety, we find that he made a clear and important distinction between the root cause of the disease and the external conditions or irritants, which upon exposure to the psoriasis patient aggravate the patient’s skin, causing manifestation of the symptoms of the disease. The WCJ’s ruling failed to make this distinction when it ruled that Carodine’s occupational disease “was either |iacaused or aggravated” by her work with both employers. Particularly as to Tech, which was not the last employer and where Carodine suffered no disabling aggravation of her condition, the WCJ was bound to determine whether the Tech employment caused an occupational disease.
 

 Regarding the root cause of the disease, its first activation or manifestation inflicting Carodine’s immune system was not attempted to be addressed by Dr. Clemons because of his opinion that the disease is of unknown origin. He explained that while some psoriasis patients appear genetically predisposed, Carodine reported no such family history. Thus, according to his testimony, there is no medical understanding at present for the cause of Carodine’s psoriasis.
 

 On the other hand, Dr. Clemons identified generally the possible irritants that caused the outbreak of Carodine’s symptoms in October 2004. He believed that her exposure to the moisture, cleansing agents, or chicken residue at Pilgrim’s could have triggered her symptoms. When informed during the deposition of Carodine’s emergency treatment for Pine-Sol exposure on October 26, he indicated that the Pine-Sol could have contributed also as an irritant. Nevertheless, he relied upon Carodine’s report to him that her symptoms were principally aggravated after working at Pilgrim’s, and his deposition reflects that he maintained the view that some skin irritant she became exposed to in that job caused the severe outbreak.
 

 No doctor testified that the contact dermatitis which Carodine experienced at Tech was an occupational disease which was contracted at |14Tech due to causes and conditions characteristic of and peculiar to her employment. The skin rashes from the bleach or other substance resolved and did not have serious disabling effects on Carodine’s employment at Tech; the rashes were not addressed in this record by medical expertise and defined as a chronic diseased condition; and for the last sixteen months of her employment, she did not claim any skin-related ailments.
 

 Carodine was never diagnosed as having psoriasis at Tech. Nevertheless, from the implications of Dr. Clemons’s testimony, there is circumstantial evidence that Caro-dine’s psoriasis had arisen within her immune system before the two incidents at Tech and that the chemical spills aggravated her condition at that time. Dr. Boers-ma, who treated her for the skin problems suffered during her Tech employment, was apparently not a dermatologist and may have missed the diagnosis of her psoriasis. In any event, however, if Carodine’s pso
 
 *1028
 
 riasis existed at Tech, its underlying cause for the infliction of her immune system would remain unknown according to Dr. Clemons’s medical description of the disease.
 

 In summary, from the medical evidence, there was proven in this case one chronic, disabling disease that continued to limit Carodine’s employment capabilities, and that disease was psoriasis. As reviewed above, Dr. Clemons’s medical description of that disease and the limited medical understanding of its root cause do not establish that its causation can be placed upon any employment activity. This disease, once activated within the employee’s immune system, may suddenly emerge at a stage of active and severe symptoms by injury or irritation to the employee’s skin | ir,suffered on the job, and if so, the workers’ compensation protection for work-related accidents may apply. Nevertheless, an ordinary cut, scrape, burn or the chapping of the skin by exposure to job conditions do not cause the disease according to Dr. Clemons’s testimony. Therefore, Carodine’s psoriasis was not shown to fall within the definition of occupational disease under our workers’ compensation law.
 

 Conclusion
 

 For the above reasons, the decision of the trial court is reversed. Costs of the appeal are assessed to appellee.
 

 REVERSED.
 

 WILLIAMS, J., concurs in result reached.
 

 APPLICATION FOR REHEARING
 

 Before WILLIAMS, STEWART, CARAWAY, PEATROSS and DREW, JJ.
 

 11 Rehearing denied.
 

 WILLIAMS and STEWART, JJ., would grant rehearing.
 

 [1]
 

 . Claimant's name is misspelled "Carrodine” in the initial 1008 Disputed Claim for Compensation Form and through the worker's compensation proceeding.