h DREW, Judge.
Printpack appeals a judgment awarding Joel Myles temporary total disability benefits and medical expenses. Concluding that the WCJ was clearly wrong in finding that Myles’ occupation as a lab technician caused his ulnar nerve neuropathy, we reverse.

FACTS

Myles worked as a lab production technician at Printpack for approximately 13 years. Printpack processed polyethylene and polypropylene plastic film and other containers used for packaging, including plastic bags for food products such as potato chips. Myles’ position required him to perform various tests on these materials, which would come off the production floor to the lab in sheets. He normally worked an eight-hour shift, although he sometimes worked 12 hours a day if another lab employee was absent. Myles would take two ten-minute breaks during his shift.
Myles testified that his ulnar nerve neu-ropathy began with tingling in his right hand that grew worse until he was in so much pain that he went to an emergency room. He reported numbness and tingling in his right hand to Printpack personnel in August of 1998. On August 28, 1998, Dr. Sanjeevi Tivakaran performed an electro diagnostic evaluation of Myles which revealed bilateral ulnar mononeuropathies at or around the elbow, with the right more severe than the left.
On September 16, 1998, Myles met with Printpack supervisors to discuss his absenteeism. He had stopped working at that *174 time, and he had already missed 230.5 hours of work that year due to a health reason [^unrelated to his ulnar nerve neu-ropathy. According to Brenda Jackson, Myles’ supervisor, Myles’ job was in jeopardy at the time because of his excessive number of absences from work. Myles mentioned the pain in his right hand during the meeting. On September 25, 1998, Myles applied for short-term disability. He received short-term disability benefits of $11.56 per hour for 20 hours per week beginning September 11, 1998. Short-term disability was a benefit sponsored by Printpack at no cost to the employee; an employee was eligible to receive these benefits for six months. Myles’ eligibility expired around March 11,1999.
Myles was referred to Dr. Thomas Edwards for an orthopedic evaluation. On October 30, 1998, Dr. Edwards performed a decompression and transposition of the right ulnar nerve. Following the surgery, Myles progressed slowly according to Dr. Edwards. Dr. Edwards released Myles to return to work the following April. On April 9, 1999, Myles tendered his letter of resignation to Printpack.
Myles filed a disputed claim for compensation against Printpack on July 14, 1999. He alleged that he had been diagnosed with ulnar nerve neuropathy that was worse in the right elbow than in the left, and that he developed this condition due to the repetitive bending, flexion and extension of his elbow while performing his job duties at Printpack.
Following trial on the merits, the WCJ rendered judgment finding that the ulnar nerve neuropathy in Myles’ right elbow was caused by his work at Printpack, that he was disabled from September 2, 1998 to April 15, 1999, and accordingly, he was entitled to temporary total disability benefits of |o$302.98 per week during that period. The WCJ found that Printpack was entitled to an offset for the short-term disability benefits paid to Myles. Print-pack was ordered to pay Myles’ medical expenses relating to treatment of his ulnar nerve neuropathy. The WCJ denied Myles’ claim for penalties and attorney fees and Printpack’s motion to dismiss and exception of prescription.
On appeal, Printpack argues that the WCJ erred in finding that Myles’ right elbow ulnar nerve neuropathy was caused by his job. Printpack also contends that the WCJ erred in denying its exception of prescription, denying its motion for involuntary dismissal and in not permitting Printpack’s expert in occupational therapy to discuss her observations of Myles’ in-court demonstrations of his position or give an opinion about whether his job put him at risk for his injury.

DISCUSSION

Printpack contends that the WCJ erred in finding that Myles’ ulnar nerve neuropathy was caused by his position as a lab technician. Myles responds that the WCJ properly found that his job was repetitive and that his ulnar nerve neuropa-thy was caused by the repetitive motion of his job.
The factual findings of the WCJ are entitled to great discretion and will be reversed only on a showing of manifest error. Alexander v. Pellerin Marble & Granite, 93-1698 (La.1/14/94), 630 So.2d 706. To reverse a factfinder’s determination, the appellate court must find from the record that a reasonable factual basis does not exist for the finding of the trial court and Rthat the record establishes that the finding is clearly wrong. Stobart v. State through Dept, of Transp. and Development, 617 So.2d 880 (La.1993).
A claim for workers’ compensation benefits due to an occupational disease is gov *175 erned by La. R.S. 23:1031.1, which provides, in relevant part:
A. Every employee who is disabled because of the contraction of an occupational disease as herein defined, or the dependent of an employee whose death is caused by an occupational disease, as herein defined, shall be entitled to the compensation provided in this Chapter the same as if said employee received personal injury by accident arising out of and in the course of his employment.
B. An occupational disease means only that disease or illness which is due to causes and conditions characteristic of and peculiar to the particular trade, occupation, process, or employment in which the employee is exposed to such disease. Occupational disease shall include injuries due to work-related carpal tunnel syndrome. Degenerative disc disease, spinal stenosis, arthritis of any type, mental illness, and heart-related or perivascular disease are specifically excluded from the classification of an occupational disease for the purpose of this Section.
C. Notwithstanding the limitations of Subsection B hereof, every laboratory technician who is disabled because of the contraction of any disease, diseased condition, or poisoning which disease, diseased condition, or poisoning is a result, whether directly or indirectly, of the nature of the work performed, or the dependent of a laboratory technician whose death is the result of a disease, diseased condition, or poisoning, whether directly or indirectly, of the nature of the work performed shall be entitled to the compensation provided in this Chapter the same as if said laboratory technician received personal injury by accident arising out of and in the course of his employment.
As used herein, the phrase “laboratory technician” shall mean any person who, because of his skills in the technical details of his work, is employed in a place devoted to experimental study in any branch of the natural or applied sciences; to the application of scientific principles of examination, testing, or analysis by instruments, apparatus, chemical or biological reactions or other scientific processes for the purposes of the natural or applied sciences; to the preparation, usually on a | Rsmall scale, of drugs, chemicals, explosives, or other products or substances for experimental or analytical purposes; or in any other similar place of employment.
Except as otherwise provided in this Subsection, any disability or death claim arising under the provisions of this Subsection shall be handled in the same manner and considered the same as disability or death claims arising due to occupational diseases.
A claimant asserting an occupational disease must prove by a preponderance of the evidence that he suffers a disability which is related to the employment-related disease, that he contracted the disease during the course of his employment, and that the disease is a result of the work performed. Hymes v. Monroe Mack Sales, 28,768 (La.App.2d Cir.10/30/96), 682 So. 2d 871.
The causal link between the employee’s occupational disease and his work-related duties must be established by a reasonable probability. Seal v. Gaylord Container Corp., 97 0688 (La.12/02/97), 704 So.2d 1161; Shields v. GNB Technologies, Inc., 33,911 (La.App. 2d Cir.10/04/00), 768 So.2d 774. The claimant will fail if he shows only a possibility that the employment caused the disease, or that other causes not related to the employment are just as likely to have caused the disease. *176 Expert testimony is required to support a finding of an occupational disease. Crotwell v. Holloway Sportswear, 32,038 (La. App. 2d Cir.6/16/99), 740 So.2d 748.
The parties disagree as to whether Subsection B or C of La. R.S. 23:1031.1 supplies the standard to examine Myles’s claim. Ordinarily, a WCJ looks to Subsection B to determine whether a claimant has suffered an occupational disease. However, Subsection C specifically applies to lab | (¡technicians, and under that subsection, the WCJ examines whether the claimant’s disease is a result, whether directly or indirectly, of the nature of the work performed. The WCJ did not articulate which standard was used in making her decision. Nonetheless, regardless of the standard used, Myles failed to establish the relationship between his job as a lab technician and his ulnar nerve neuro-pathy.
When questioned at trial about his job duties, Myles described performing these tests:
GC test: Using an approximately 8-/6" by 11" flat plastic template with a handle that stuck straight up, Myles would cut a sample using a six-inch utility knife. The sample was placed in a jar, which was then placed in an oven. Using a syringe, Myles then extracted gas from the jar and injected the gas into a gas chromatography machine.
COF test: Myles cut two samples, placed one sample on the coefficient of friction tester and placed a weighted plate on top of the other sample. He then turned a switch on and the sample would slide down to test the friction.
Coating weights test: Using a different template that was smaller than the one previously noted, Myles cut a sample, wiped off the ink and weighed the sample. Myles then removed this sample from the scale, pulled the sample apart, wiped off any adhesive and weighed the sample again.
Bond test: Myles cut out a sample without using a template and placed the material in an Elendorf tester to cut out the sample’s seam. Myles operated the Elendorf tester by pushing down on a lever. The sample was then placed in an Instrom machine, apparently to test the strength of the seam.
Heat seal test: Myles cut out a sample using the utility knife but again without using a template. After folding the sample, Myles placed it in a machine that sealed it. The sample was removed and placed in Elendorf tester to cut it, then placed in the Instrom machine to pull the sample in order to test the strength of the heat seal.
17Thermo-strip test: For some packages, a thin thermo-strip coating was placed over the film. Utilizing a template measuring approximately three feet by two inches, Myles cut a sample, which he weighed on a scale. He then removed the coating using a chemical and weighed the sample.
Odor test: Myles cut out three layers of film using a template, put the layers in a jar and placed the jar in an oven. The template used was the same size as the one used for the GC test.
Ink adhesion test: Myles laid the material on a table, pressed tape on the material and then pulled the tape off to determine if all the ink remained on the material. The tape was about 3/4 of an inch wide and 24 inches in length. Heat-resistance test: Myles cut out a sample that was about six inches long and four inches wide, placed the film on a piece of cardboard and put it in the heat sealing machine.
Bertha Jackson, Myles’ lab supervisor, added that the tear test, slow-rate pen *177 etration test, opacity test, optical density test, UPC scan test and the water vapor tests were some of the other tests performed by the lab technicians.
In the center of the lab were two large tables; cutting along the templates was generally done at these tables, except for samples cut for the GC and odor tests which were cut at a table in the GC test room where an oven was located. The different testing stations other than the GC test room were around the perimeter of the lab.
The materials to be cut for testing of samples depended on what was being produced that day. Myles agreed that Print-pack produced a large variety of plastic containers. The tests to be performed were set out in a company manual. Specific tests were occasionally requested by the production employees. Usually the materials were brought to the lab, but Issometimes Myles would have to go to the production floor and cut a sample from a roll.
Myles would sometimes fold the material into several layers before cutting it with the utility knife. Some of the samples were laminated or had a film backing. Myles estimated that the thickest material he cut with a utility knife was a Polaroid film container. He used the most force to cut the Polaroid samples, although he admitted that he did not cut Polaroid samples on each day. Jackson testified that generally the thickest material they would cut were Kodak film containers, and she would have to exert force to cut them. Filed into evidence were two sheets of plastic used as bags for Runts and Sweet Tart candies.
The parties stipulated that Dr. Thomas Edwards was an expert in the field of orthopedic surgery. Dr. Edwards related that the causes of ulnar nerve neuropathy include direct pressure, repetitive motion, subluxation of the ulnar nerve or it can simply be insidious in onset. The WCJ noted in her reasons for judgment that Myles’ position involved “some repetitive action” and that Myles was “somewhat of a nervous, fast-paced person[.]” Nevertheless, Myles’ job was not “repetitive” as that term was understood by Dr. Edwards in listing the possible causes of ulnar nerve neuropathy.
Dr. Edwards considered bending and straightening the elbow over and over again to be a repetitive motion, and agreed that an assembly line worker would be an example of someoné engaged in repetitive motion. He also agreed that cyclical flex-ion and extension of the elbow could place the ulnar nerve at risk of injury. He explained that what he meant by “repetitive | gextension/flexion of the elbow” was moving the elbow “back and forth in a straight fashion.” Dr. Edwards later elaborated more fully on what he meant by a repetitive task:
Counsel for Myles: So if he did the cutting that Ms. Ross described for you — let’s assume he works 8 to 12 hours a day cutting those samples that we’re talking about. Now, I know you said he was using his shoulders somewhat, too, but is that the bending?
Dr. Edwards: That’s not exactly what I had in mind as far as flexion and extension of his elbow. I would be saying taking something off an assembly line and bending his elbow and putting it somewhere else. This is what I would think would be repetitive.
Although Myles testified that he could not work at his own pace, this was not because he was fed a constant stream of samples to be tested, but was more the result of not keeping production idling while waiting for him to perform a test. The samples were either brought to Myles *178 by the production employees or he would go to the production area to retrieve them. The number of samples he was required to test varied depending on the number of production machines being operated that day. Although each test would be performed at least once a day, the number of times each test was performed on a given day also depended on what was being produced that day. During the course of a day, Myles varied his functions by moving around the lab from cutting to testing to writing down the results.
Myles described his average day at work as “busy”, and he testified that he was so busy on some days that he did not take his allotted breaks and was unable to keep up with the demands for testing. Jackson testified that lab technicians were required to work at a sufficient pace to prevent | ^production from being stopped for too long while waiting on a test result. It was significant to Dr. Edwards that Myles did not perform the same specific task again and again, as he stated during his deposition:
Counsel for Printpack: If the worker has an opportunity in his job duties to vary his functions rather than repeating the same motion one right after the other, can go from one test to another test and use different hand positions, spend some time cutting around the template as I’ve described, spend some more time inserting the plastic material in the machine for tests, would that reduce the risk for ulnar nerve injury? Dr. Edwards: As opposed to being in a situation where you are constantly bending and straightening your elbow in a repetitive fashion, yeah. To answer your question, it would be yes.
At any rate, Dr. Edwards never testified that Myles’ job was anything more than a possible cause of his condition. Dr. Edwards testified that he did not know any of the specifics or details of Myles’ job duties; therefore, as of the date of the deposition, he was unable to give an opinion as to whether the nerve condition was related to Myles’ job. When again asked if he could give an opinion about causation, Dr. Edwards replied that he didn’t know exactly what Myles’ job required except what had been related to him in “somewhat loose terms.” He stated that he would need to know how often Myles bent and straightened his elbow and whether this was done in “assembly like” fashion.
The closest Dr. Edwards came to giving an opinion as to causation was when he stated:
“If he has, repetitively bends and then straightens and bends his elbows in a repetitive fashion on a daily basis, that can be a cause. If you want to say ‘can be a probable cause,’ yes, that can be a probable cause.”
lnHowever, this answer is placed in proper context when read in conjunction with the question and answer that immediately followed it:
Counsel for Myles: And if he doesn’t have the other ones, then that, like I said that, would highlight that as a probable cause as opposed to the other ones that are either nonexistent or noncontributory?
Dr. Edwards: I’m not sure — you’re trying to put words in my mouth; I’m not going to respond to that.
In sum, Dr. Edwards could not offer an opinion as to what caused the ulnar nerve neuropathy in Myles’ circumstance because he did not know what Myles’ job entailed. In addition, Myles’ ability to vary his tasks as opposed to remaining in one place while cutting did not fit Dr. Edwards’ description of repetitive movement involving a constant bending and straightening of the elbow.
*179 Besides repetitive motion, Dr. Edwards testified that some other causes of ulnar nerve neuropathy include subluxation of the nerve, direct pressure, and a cause that is insidious in onset. Dr. Edwards found no evidence of subluxation. When asked to give an example of direct pressure, Dr. Edwards gave the example of someone reading while propped up on his elbows. He also agreed that direct pressure on the inside of the elbow could come from propping the elbows on a table or propping the elbows on the arm of a chair to hold a book while reading. This sort of pressure would need to be prolonged.
Myles enjoyed reading and would sometimes read for as long as 12 hours in a day. Myles testified that when he read while sitting down, even when at a table, he would often hold the book in his lap with his arms | ^resting on his legs. Asked if he ever read by holding a book in his hands with his palms up and his elbows bent, he responded, “I read any way that I feel comfortable.” Myles testified that he never bumped his elbow and was never propped up on his elbows for a prolonged period. He denied propping himself up on his elbows while reading, and added that he often stood while reading.
Ulnar nerve neuropathy is considered to be insidious in onset when the doctor is unable to determine the cause. In such circumstances, the onset of the ulnar nerve neuropathy is gradual and there is no specific injury that causes the condition. Myles testified that the tingling sensation began in his right hand. He related that he also had the tingling sensation in his left hand, but it was not as severe as with the right hand. He recalled that he had the problem with tingling in his left hand before he left work in August of 1998. Myles still had the same sensation in his left hand at the time of trial. We note that Myles is right-handed.
The application for short-term disability signed by Myles contained the statement that short-term disability was paid “for injuries and/or illnesses which arise from conditions which are not related to or caused by conditions from work.” We also note that when Myles filled out the patient registration form to see Dr. Edwards, he checked “No” when asked if he was injured on the job.
The testimony of Myles and Brenda Jackson is lacking on the issue of causation. The most both could offer was their own layperson’s version of what constituted a repetitive task, which was in contrast to what Dr. |13Edwards, tendered as an expert, meant by the term repetitive motion as a cause of ulnar nerve neuropathy. As such, there is no reasonable factual basis in the record for the WCJ’s finding that Myles’ job as a lab technician at Printpack caused his ulnar nerve neuropa-thy, and this finding was clearly wrong. Accordingly,' the WGJ erred in awarding temporary total disability benefits. Because we reverse the WCJ on the awarding of workers’ compensation benefits, it is unnecessary for this court to address the remaining issues raised by Printpack on this appeal.

DECREE

At appellee’s costs, the judgment is REVERSED.