DREW, J.
 

 |) Carolyn Fortner appeals a judgment dismissing her workers’ compensation claim in which she alleged that she suffered an occupational disease while employed at Guide Corporation’s plant in
 
 *1037
 
 Monroe, where she worked until the plant closed in December of 2006.
 

 We affirm.
 

 FACTS
 

 Fortner began working at the Guide plant in April of 2000 as a machine operator whose job was to assemble automobile headlamps. In the plant area where she initially worked, the Fast Assembly Area, there were seven different stations on the line, and she had to change stations each hour. In her last two years working at the plant, Fortner primarily worked as an inspector looking for defects in the finished products.
 

 In January of 2004, Fortner and other employees were shifted to different areas of the plant. She began working in the sonic weld area, where she had to pull molds off the line and break them apart. She asserted that after she moved to this area, she became nauseated, was short of breath, and began coughing often.
 
 [1]
 

 2004 Medical History
 

 On January 9, Fortner went to the on-site Guide Medical Department (“Department”) with complaints of chest tightness, which she reported that she experienced when her blood pressure was elevated. Fortner, who has hypertension, wanted her blood pressure checked. Fortner told the attending nurse that she thought her condition might be caused by having |2been moved to a new area of the plant. Fortner went to Glenwood Regional Medical Center (“Glenwood”), where a single chest x-ray was negative.
 

 Dr. Alyce Adams, whose specialties are internal medicine and cardiology, was Fortner’s regular physician.
 
 [2]
 
 Fortner told Dr. Adams that she had recurrent asthma with exacerbations while at work. When Dr. Adams examined Fortner on January 21, her chief complaint was chest tightness.
 

 Fortner told Dr. Adams on February 4 that she had been coughing all day and night and was having nasal congestion. When Fortner met with Dr. Adams on February 11, she told Dr. Adams that she had been coughing since breathing a chemical at work one month earlier. Dr. Adams again treated Fortner for her persistent cough two days later.
 

 Fortner went to the Department on February 17 with complaints of coughing and nausea from inhalation of fumes. She was brought to the emergency room at Glenwood, where she reported that she had been experiencing intermittent shortness of breath since being exposed to a chemical at work one month earlier.
 

 Dr. Adams treated Fortner the following day for wheezing, and her assessment was new onset asthma. Fortner came to Dr. Adams with more complaints of wheezing and persistent cough on February 20. Because Dr. Adams thought the asthma might have been caused by an allergy to something with which she came into contact, Dr. Adams referred Fortner to Dr. Benjamin Oyefara, an allergist, and to Dr. Scott Irby, whose specialty |swas pulmonary medicine. Once Dr. Adams referred Fortner, she mostly left it up to the other doctors to treat Fortner’s asthma.
 

 Dr. Irby first treated Fortner on February 25. Fortner told Dr. Irby that Guide had moved her to a different room where she was exposed to harsh chemicals that caused her to cough, and that she would
 
 *1038
 
 not stop coughing until 5-10 minutes after she left the plant. Fortner denied a history of asthma. A pulmonary function test was normal. At the time, Dr. Irby doubted that Fortner had occupational asthma. He thought her cough may be related to acid reflux, or medication that she was taking for hypertension, or could be psychogenic.
 

 On February 27, Fortner told Dr. Adams that her cough had gotten somewhat better. Dr. Adams noted that one possible cause of the cough, Fortner’s hypertension medicine, had been discontinued.
 

 Fortner went to the Department on March 4 with concerns about her breathing. An ambulance transported her to the emergency room. Dr. Irby’s office performed a pulmonary function test the next day. Dr. Irby examined Fortner on March 8. She told him that she had returned to work on the prior Monday, but had an asthmatic attack on Thursday. Fortner thought that she might be over the attack, but she was unsure. She described her asthmatic episodes as consisting of only coughing and wheezing, and said the episodes did not scare her. Dr. Irby’s impression was that it was difficult to say whether or not there was a problem. He thought Fortner should see an occupational physician, Dr. Katherine Rathbun, and should avoid her workplace until cleared by Dr. Rathbun.
 

 |4On March 19, Dr. Adams treated Fort-ner, whose chief complaint was intermittent symptoms of coughing and asthma.
 

 Fortner was first examined by Dr. Rath-bun on March 31. She told Dr. Rathbun that she had no history of asthma, she worked in a chemical plant, and had suffered 14 severe asthma attacks in the plant in three months that were triggered by specific chemicals in one area, namely UV acrylic adhesive, n-butyl acetate, and iso-propanol. Two x-rays of the chest taken on April 5 did not show any active disease.
 

 Dr. Rathbun next examined Fortner on April 12. Fortner told her that she had not been back to work since her last visit, and had not had an asthma attack since leaving work. Dr. Rathbun’s assessment was that Fortner had asthma from sensitization to “specific chemicals.” It was recommended that she be restricted from working in areas of the plant where there was any possibility of exposure to acrylic adhesive. Following this visit, Dr. Rath-bun completed a return to work certificate on which she wrote that Fortner was permanently restricted from exposure at any level to UV acrylic adhesive as she was sensitized.
 

 On April 19, Dr. Irby treated Fortner. Dr. Irby learned that Dr. Rathbun thought Fortner was allergic to UV acrylic adhesive and was never to be exposed to it again. Fortner told Dr. Irby that she had been exposed to the adhesive only after being moved to another department, but was now breathing fine. His impression was asthma secondary to allergy to UV acrylic adhesive, which she was to avoid at the plant in the future.
 

 | Jn May, Dr. Rathbun explained to Fortner over the phone that she was not disabled and could return to work immediately, but could not be exposed to the chemical to which she was sensitized as it could kill her.
 

 The Department’s records reflect an entry on June 2 stating that it had been provided with a doctor’s authorization for Fortner to return to work with the restriction that she not work in or around n-butyl acetate fumes.
 

 On June 3, Fortner informed the Department that a fan was blowing fumes off a lamp on which she was working, causing her to have difficulty breathing. Fortner
 
 *1039
 
 was sent to the hospital. Later that month, Fortner again complained to the Department about breathing difficulties.
 

 Dr. Rathbun’s conclusions about Fort-ner’s condition changed dramatically in June. The doctor’s notes from June 21 reflect that she had spoken with the plant’s safety director, who told Dr. Rath-bun that Fortner reacts to something else every time they move her. Dr. Rathbun believed that Fortner had probable panic attacks, and not asthma or sensitization by current tests. Dr. Rathbun wanted to stop her asthma medications and refer her to a psychiatrist. Dr. Rathbun recommended that Fortner have a pulmonary function test at the plant before work and then anytime she felt short of breath at work, and was not to go to the doctor with an “asthma attack” unless the pulmonary function test was abnormal. This was discussed at length with Fortner. Dr. Rath-bun also noted that she received a call from Debra Benton, the union safety inspector, and told her that Fortner appeared to have panic attacks and not asthma attacks, and explained how she wanted a pulmonary function test done before Fortner |fiwent into the plant and then at any time at the plant when she felt short of breath. On July 19, Dr. Rathbun noted that Fortner had anemia, mild asthma, and resolving anxiety attacks. Fortner’s physicians were not made aware of Dr. Rath-burn’s change of diagnosis.
 

 On August 17, Fortner complained to the Department that she suffered an asthma attack when she was exposed to strong fumes as she walked past an open door near the lens mold area after a break. Ten days later, Fortner returned to the Department with the complaint that her breathing had been compromised when she was exposed to fumes from a welder truck that passed her as she was returning from her break.
 

 Dr. Irby treated Fortner on August 24. She reported a couple of asthma attacks at the plant, but that none of the attacks had been serious or lasted more than 20 minutes. She told Dr. Irby that the attacks occurred only at work.
 

 Dr. Rathbun met with Fortner for the last time on September 21. Dr. Rathbun noted that Fortner had either mild asthma or panic attacks, and it was not clear which one it was, but her condition was probably a mixture of both.
 

 On September 29, Fortner asserted that a disinfectant used in the Department caused her asthma to flare up. Fortner went to the Department on October 5, with complaints of respiratory distress caused by diesel fumes coming from a welder truck that passed her work station.
 

 Dr. Irby treated Fortner on October 18. She reported having experienced a little wheezing over the weekend. She also told Dr. Irby that |7she felt she was having an asthma attack during a pulmonary function test. The test levels were entirely normal, although it was noted that she responded to a bronchodilator challenge on the test, which could indicate asthma.
 

 On October 22, Fortner reported to the Department that she was short of breath and was having difficulty breathing after smelling something similar to enamel in the air near her work area.
 

 Fortner’s work-related complaints were not limited to the respiratory system. She came to the Department on November 19 with a rash on her cheeks and neck that developed while working. Her supervisor was instructed to move her. Dr. Adams treated Fortner on November 24, when she complained of asthma as well as irritation on her face from contact with an allergen at work.
 

 On December 1, Fortner developed a rash on her face and cheeks while working
 
 *1040
 
 a different line. Her supervisor was instructed to move her again. The next day, Fortner complained to the Department about burning and stinging of her face. Dr. Adams treated Fortner on December 3, when her chief complaint was multiple allergies. Fortner also reported abdominal discomfort due to gastroesophageal reflux disease.
 

 Dr. Benjamin Oyefara, the allergist recommended by Dr. Adams, treated Fortner on December 7. His assessment was gas-trolaryngeal reflux disease. Dr. Oyefara wrote a note to Guide on December 9, stating that Fortner’s condition was consistent with contact dermatitis triggered by |schemical exposure at work. Dr. Oye-fara recommended that she be restricted to an area where she was not exposed to certain chemicals.
 

 The Department’s records reflect that on December 9, Guide was provided with a doctor’s authorization for Fortner to return to work with the restriction that she work in an area free of n-butyl acetate fumes and UV coating and adhesive.
 

 On December 31, Fortner complained to the Department about feeling a burning sensation on her face while working.
 

 2005 Medical History
 

 On January 8, Fortner went to the Department complaining of difficulty when breathing. When Dr. Oyefara treated her on January 13, she gave him a history of suffering acute exacerbation of asthma five days earlier, and that she got better after going home. His assessment was moderate persistent asthma, contact dermatitis, and gastroesophageal reflux disease. Dr. Oyefara again recommended that she be restricted at work to areas where she would not be exposed to certain chemicals.
 

 On March 2, Fortner complained to the Department about an asthma attack. On March 9, she showed up at the Department with a rash on the side of her neck that she asserted was caused by glue that happened to be near a vent. Fortner claimed the rash did not develop until she was moved out of her department, and that she was always being moved despite restrictions to avoid fumes. She was treated at Glenwood.
 

 On March 11, Fortner reported to the Department that she had an asthma attack that was caused by dust from sweeping being done by another |9employee in her department. Fortner complained to the Department of breathing difficulties on March 23, chest tightness on April 11, and wheezing and shortness of breath seven days later.
 

 Dr. Irby treated Fortner on April 19. It was noted that Fortner was doing well, had returned to work, and had to use a respiratory treatment only one time that past week.
 

 Fortner went to the Department twice in May. On May 10, she felt hot and dizzy. On May 13, she reported a sudden asthma attack, and left the plant in an ambulance. She was treated at Glenwood for respiratory distress.
 

 Dr. Adams treated Fortner on June 3. Her chief complaint was asthma. Fortner also reported having multiple allergies.
 

 Fortner went to the Department on August 26 complaining of diesel fumes from a truck that had been in the plant.
 

 Dr. Irby treated Fortner on October 18. It was noted that Fortner was doing very well, and that her asthma had been very well controlled. Fortner was reporting only occasional difficulty at work. Dr. Irby’s impression was that her asthma from an allergy to UV acrylic adhesive was much improved. On November 18, Fort-ner complained to the Department that she was having difficulty breathing from
 
 *1041
 
 asthma and because of smoke in the plant from a Dumpster fire.
 

 2006 Medical History
 

 On January 14, Fortner was treated for chest pain and shortness of breath at Glen-wood.
 

 11ftThe Department’s records reflect it was provided on March 10 with a doctor’s authorization for Fortner to return to work with the restriction that she not be exposed to chemicals.
 

 Fortner was treated for asthma and shortness of breath at Glenwood on March 29. Dr. Adams examined Fortner the next day, when she reported acute asthma exacerbation while at work.
 

 On April 1, Fortner went to Glenwood complaining of a cough and a sore throat. Dr. Adams treated Fortner two days later. She complained mainly of coughing, and told Dr. Adams about her recent visit to the emergency room. His assessment included chronic bronchitis.
 

 Dr. Irby’s clinic performed a pulmonary function test on April 17. Fortner had moderate airway obstruction, which meant significant wheezing. This was the first time that she had an abnormal pulmonary function test. Dr. Irby thought this test result was a very significant finding. Fortner reported to Dr. Irby that she felt pretty good at the time. His impression was asthma that appeared to be work-related with an allergy to UV acrylic adhesive.
 

 Fortner reported to the Department on September 18 that she had shortness of breath and had started coughing when she returned to her line after a break and smelled an ammonia-like odor. On September 27, Fortner complained to the Department about fumes and smoke from the sonic weld area.
 

 Dr. Irby treated Fortner on October 18. She reported for the first time that she always has wheezing, even when she had been away from work for ^several months. Dr. Irby testified that on a blowing test, her FEV1, which measures the degree of wheezing, had worsened a bit despite her medications being increased. His impression was occupational induced asthma that now appeared to be lifelong even though she had been away from her exposure, and that it appeared to be worsening.
 

 When Dr. Adams examined Fortner on October 30, her primary complaint was asthma from job exposure.
 

 Dr. Irby next treated Fortner on December 13. Dr. Irby recalled that Fort-ner complained of a little wheezing. His impression was occupational asthma gradually worsening over the years despite absence of exposure. No tests were performed during this visit.
 

 2007 and 2008 Medical History
 

 Dr. Irby’s clinic performed a pulmonary function test on June 6, 2007. Fortner had severe obstructive airways disease. According to Dr. Irby, her FEV1 was down to 36%, and a person with that reading would generally become out of breath walking to the bathroom, and would be more susceptible to pneumonia, and that it was a debilitating condition.
 

 Dr. Irby also examined Fortner on June 6. He noted that except for steroids, she had been maximally treated. She had shortness of breath with minimal exertion. Her condition appeared to Dr. Irby to be much worsened. His impression was severe obstructive ventilator defect secondary to occupational asthma secondary to UV adhesive and butyl acetate exposure at the plant.
 

 112Pr. Irby treated Fortner on January 7, 2008. He noted that she was doing as well as could be expected, and that she had
 
 *1042
 
 shortness of breath with minimal exertion. She continued being maximally treated for her asthma except for taking a daily oral steroid. His impression remained occupational asthma with severe obstructive defect as per the test in June.
 

 Procedural History
 

 Fortner filed her disputed claim for compensation form in May of 2006. She contended that she suffered an occupational disease caused by chemical exposure beginning in January of 2004. Guide denied that Fortner’s condition was work-related or that she was disabled.
 

 This matter was tried in September of 2008. The WCJ concluded that even though Fortner has asthma that was often triggered and/or aggravated by conditions at work, there was insufficient evidence demonstrating causation and a resulting disability. The WCJ additionally noted that even if the asthma had been caused by conditions at the plant, Fortner stopped working not because of any disability, but because the plant closed. Fortner has appealed.
 

 DISCUSSION
 

 Factual findings in workers’ compensation cases are subject to the manifest error or clearly wrong standard of appellate review.
 
 Banks v. Industrial Roofing & Sheet Metal Works, Inc.,
 
 96-2840 (La.7/1/97), 696 So.2d 551. In applying the manifest error-clearly wrong standard, the appellate court must determine not whether the trier of fact was right or wrong, but whether the fact finder’s conclusion was a reasonable one.
 
 Id.
 
 When there |13is a conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed even though the appellate court may feel that its own inferences and evaluations are as reasonable.
 
 Rosell v. ESCO,
 
 549 So.2d 840 (La.1989);
 
 Arceneaux v. Domingue,
 
 365 So.2d 1330 (La.1978). Where there are two permissible views of the evidence, the fact finder’s choice between them cannot be manifestly erroneous or clearly wrong.
 
 Stobart v. State through Dept. of Transp. and Development,
 
 617 So.2d 880 (La.1993).
 

 In reference to workers’ compensation claims for occupational diseases, La. R.S. 23:1031.1 states, in part:
 

 A. Every employee who is disabled because of the contraction of an occupational disease as herein defined, or the dependent of an employee whose death is caused by an occupational disease, as herein defined, shall be entitled to the compensation provided in this Chapter the same as if said employee received personal injury by accident arising out of and in the course of his employment.
 

 B. An occupational disease means only that disease or illness which is due to causes and conditions characteristic of and peculiar to the particular trade, occupation, process, or employment in which the employee is exposed to such disease. Occupational disease shall include injuries due to work-related carpal tunnel syndrome. Degenerative disc disease, spinal stenosis, arthritis of any type, mental illness, and heart-related or perivascular disease are specifically excluded from the classification of an occupational disease for the purpose of this Section.
 

 The claimant asserting an occupational disease must prove, by a preponderance of evidence, a disability related to an employment-related disease, that it was contracted during the course of employment, and that it is the result of the work performed.
 
 J.P. Morgan Chase v. Louis,
 
 44,309 (La.App.2d Cir.5/13/09), 12 So.3d 440;
 
 Lee v. Schumpert,
 
 36,733 (La.App.2d14 Cir.1/29/03), 836 So.2d 1214. The
 
 *1043
 
 causal link between the claimant’s illness and the work-related duties must be established by a reasonable probability.
 
 Seal v. Gaylord Container Corp.,
 
 97-0688 (La.12/2/97), 704 So.2d 1161;
 
 Shields v. GNB Technologies, Inc.,
 
 38,911 (La.App.2d Cir.10/4/00), 768 So.2d 774. The claimant will fail if there is only a possibility that the employment caused the disease, or if other causes not related to the employment are just as likely to have caused it.
 
 Lee, supra.
 
 Expert testimony is required to support a finding of an occupational disease.
 
 Id.
 

 Dr. Irby agreed that his diagnosis of an occupational disease was based on a process of elimination.
 
 [3]
 
 Since there was no scientific evidence showing it was caused by conditions at work, he depended on history provided by Fortner, who was claiming the onset of asthma in her early 40s, to relate her asthma to the plant.
 

 The three tests that Dr. Irby performed on Fortner were pulmonary function tests, chest x-rays, and exercise oximetry tests. Dr. Irby agreed that these tests were not designed to detect what chemical compound may have caused the symptoms; rather, they are intended to prove the existence of a pulmonary problem, the degree of the problem, and if the problem will progress. Her first several pulmonary function tests were normal, but eventually the results became abnormal enough that he could measure the asthma, and her asthma gradually worsened until it became severe.
 

 11sDr. Irby stated that based upon his visits with Fortner, he was confident that her difficulties were most likely caused by her sensitivity to a chemical at work because other potential causes were removed by a process of elimination. He recalled that when he saw first saw her, she had just been taken off the hypertension medication Lotrel, which can cause a dry cough. She had also just start taking an acid reflux medication, and acid reflux is the top cause of asthma in adults. Dr. Irby reasoned that the Lotrel, the acid reflux or a panic attack could have been the cause of her cough.
 

 Dr. Irby stated that although he did not define a particular chemical that caused her problem, he had a particular place that caused her problem, at least according to Fortner. But he believed that she was telling the truth because she told the truth from the beginning about her asthma symptoms even when the tests originally came back normal and he was doubtful that she even had asthma. He simply could not find any other reason for Fort-ner to develop asthma other than the chemicals she was exposed to while employed at the plant.
 

 But the record is clear that Fortner’s asthma attacks were not limited to the workplace. Fortner has had asthma attacks when she came into contact with chemicals outside of work such as smoke, air fresheners, aerosol cleaners, perfumes, and colognes. Pumping gas can trigger an attack according to Fortner. Nevertheless, Fortner contends that her episodes of asthma are not as severe since she stopped working at the plant, although she still has to take daily medications for her asthma.
 

 | KjWhen Dr. Irby noted on April 19, 2004, that Fortner’s asthma was secondary to allergy to UV acrylic adhesive, he was relying on Dr. Rathbun’s assessment on April 12, 2004, that she was sensitized to UV acrylic adhesive. This was in a note that Fortner had from Dr. Rathbun.
 

 
 *1044
 
 Dr. Irby did not know what tests Dr. Rathbun performed to come to her conclusion of an allergy to UV acrylic adhesive. He also did not have any records from Dr. Rathbun other than the note that he referred to on April 19. Dr. Irby thought that Dr. Rathbun’s conclusion of allergy to UV acrylic adhesive was based upon what Fortner had told her.
 

 For all her supposed candidness, Fort-ner never provided Dr. Irby with Dr. Rathbun’s later assessments that doubted sensitization and suspected panic attacks, much less told him about them.
 
 [4]
 
 Dr. Irby was ultimately dismissive of any findings made by Dr. Rathbun because he believed that she was too quick to jump to conclusions.
 

 Fortner insisted that prior to seeing Dr. Rathbun, she had no idea what chemical was causing her asthma attacks. She contended it was Dr. Rathbun who first mentioned UV acrylic adhesive, n-butyl acetate, and isopropanol. She denied telling Dr. Rathbun about these chemicals, which were present at the plant.
 

 Nevertheless, when Fortner first met with Dr. Rathbun, she brought along Material Data Safety Sheets for isopropanol anhydrous and n-butyl acetate. Fortner insisted that she could not recall who in the plant’s Health 117and Safety Area gave these sheets to her. She denied that Debra Benton, her sister-in-law, who was also the UAW Safety Representative at the plant, told her to take the sheets to Dr. Rathbun and say she was exposed to n-butyl acetate.
 

 For her part, Benton admitted assisting Fortner in getting the sheets. Benton already had the n-butyl acetate sheet in her possession, but the other one was provided by the industrial hygienist. Benton testified that Fortner had asked her to get it, so she got it from the hygienist and gave it to Fortner.
 

 Fortner denied that she asked Benton to call Dr. Rathbun. She added that she did not know why Benton called Dr. Rathbun, and that Benton never talked to her about calling Dr. Rathbun.
 

 Benton testified in detail about the air testing procedures at the plant. She explained that scheduled and unscheduled air samples were taken, and the unscheduled ones were generally taken when someone complained about conditions at the plant. The air at the plant was tested mostly for styrene, n-butyl acetate, methyl alcohol, ethyl methylene, and for dust particles. If an air reading was above certain levels, they would normally shut down the machinery and search for the source of the problem.
 
 [5]
 
 Benton had access to the results of any testing, yet none were introduced to support her statement that breathing problems were a' regular occurrence at the plant. No air sample records were submitted showing levels of chemicals on specific days when Fortner complained of breathing difficulties.
 

 1 ,sDr. William George is a pharmacologist and a toxicologist. He served as Director of the Drug Analysis Lab at Tulane University, as well as the Director of Toxicology at Tulane. Dr. George testified that n-butyl acetate has a fairly high
 
 *1045
 
 threshold limit value, permissible exposure level, and short-term exposure level, and a very low odor threshold; he explained this meant that the chemical could be easily smelled, but was not necessarily harmful when smelled.
 
 [6]
 
 He noted that he did not believe that exposure to n-butyl acetate fumes could cause contact dermatitis.
 

 Dr. George testified that he could not find a causal relationship between asthma and n-butyl acetate in the literature on asthma that he examined. Dr. George noted that he could find nothing in the records where there was a measurement of or an indication of any specific exposure to n-butyl acetate at levels that would have produced effects on the body.
 
 [7]
 
 He opined that it was unlikely that exposure to n-butyl acetate would have caused Fortner’s asthma. Further, he explained that asthma could be caused by exposure to allergens, pollens, dust, a variety of compounds, and even temperature changes.
 

 Accordingly, based upon our review of this record, we find that the WCJ was not clearly wrong in denying Fortner’s claim.
 

 CONCLUSION
 

 At Fortner’s cost, the judgment is AFFIRMED.
 

 APPLICATION FOR REHEARING
 

 Before WILLIAMS, STEWART, CARAWAY, PEATROSS and DREW, JJ.
 

 Rehearing denied.
 

 [1]
 

 . In 2002, Fortner had complained of tightness in her chest and had become faint after she took a shortcut through the BAT room, which is where the molds were made.
 

 [2]
 

 . Dr. Adams began treating Fortner in 2002.
 

 [3]
 

 . Dr. Adams testified that he would refer a patient in order to determine the existence of occupational induced asthma through scientific methods. He followed Dr. Irby's diagnosis of occupational induced asthma.
 

 [4]
 

 . Fortner denied that Dr. Rathbun discussed the diagnosis of probable panic attack with her. Fortner contended that Dr. Rathbun came up with the panic attack diagnosis after a nurse from the Department had called Dr. Rathbun and said Fortner had mental problems.
 

 [5]
 

 . Sometimes these air readings would be below levels required by the government and Guide, but would be above nuisance or irritant levels.
 

 [6]
 

 . Dr. George testified that the levels at which effects are seen are higher than the levels used as standards. This also takes into account differences among individuals.
 

 [7]
 

 . The presence of n-butyl acetate can be detected through blood and urine tests.