GARRETT, J.
The claimant, Rhonda Johnson, appeals from a judgment dismissing her claims for workers' compensation benefits against her employer, Manitowoc Co., d/b/a Frymaster Co., and its insurer, Sentry Insurance, A Mutual Company. In written reasons, the workers' compensation judge ("WCJ") concluded that the claimant, who suffers from de Quervain's tenosynovitis ("DQT"), failed to prove that she suffered from an occupational disease caused by her job. We affirm.
FACTS
Frymaster builds commercial frying equipment for companies like McDonald's, Burger King, and Wendy's. It operates two plants in Shreveport and employs about 550 people.
The claimant was employed by Frymaster in 1999. She worked in several different positions, all of which required typing for several hours per day. After being an order processor for two to three years, the claimant worked as a Customer Service Representative I for about two years and a Customer Service Representative II for seven to eight years. She testified that she spent about four hours per day typing in these positions. She was promoted to Customer Service Representative III in April 2015. She testified that this job required *465 typing between four and five hours per day. This job was described at trial by Frymaster's representative as a "customer interfacing position." It involved taking calls from dealer groups, taking orders, preparing orders, and making copies for files. It required her to utilize email, the telephone, and the fax machine.
In about 2002, she was successfully treated for carpal tunnel syndrome ("CTS") in both hands with conservative measures that did not include surgery. She did not make a workers' compensation claim for her CTS. She testified that in July 2015, she developed pain in her right thumb, wrist, and hand. She was treated by Dr. Gordon Mead, an orthopedic surgeon, for these complaints along with claims of knee and foot pain. In January 2016, he diagnosed her as suffering from DQT. Her employment with Frymaster was terminated in early February 2016, shortly after she contacted the human resources department about her wrist issue.
In March 2016, the claimant filed a disputed claim for compensation with the Office of Workers' Compensation. She asserted that, due to repetitive keyboard operation during the last 16 years, she had developed DQT in her right hand and wrist. She claimed that she had been diagnosed in August 2015 and was fired when she inquired about workers' compensation benefits in January 2016. She sought penalties and attorney fees for the employer's failure to authorize medical treatment and pay weekly indemnity benefits. The employer and its insurer answered with a general denial in April 2016.
Trial was held on July 26, 2017. In addition to the claimant's medical and personnel records, the parties submitted the depositions of Dr. Mead, the claimant's treating physician, and Dr. Kenneth Odinet, the physician chosen by the employer. Additionally, the claimant testified, as did John Leslie Baker, Frymaster's human resources director and its representative at trial.
In her testimony, the claimant stated that she began feeling pain in her right thumb in July 2015, that she could not move it, and that it kept locking up on her. She also described tenderness that went from over her knuckles on her right hand to midway between her wrist and elbow. She was referred to Dr. Mead by a coworker and saw him for the first time in August 2015. She testified that she last worked at Frymaster on December 18, 2015, and was on vacation until she saw Dr. Mead for the second time on January 4, 2016. She testified that, after her appointments on January 4 and 11, 2016, Dr. Mead had her take a week off of work.
The claimant asserted that she never realized that she had a workers' compensation claim until January 18, 2016, when it was mentioned by a receptionist at the occupational therapy clinic to which she had been sent by Dr. Mead. When the claimant turned in her paperwork, the receptionist asked, for billing purposes, whether she was there for a workers' compensation matter. The claimant then made inquiries to her claims examiner at Matrix Absence Management, a third-party company used by Frymaster to process matters arising under the Family and Medical Leave Act. Next, she contacted Frymaster's human resources department. Subsequently, she received a letter terminating her employment with Frymaster in early February 2016.
Baker explained the steps of Frymaster's progressive disciplinary process, which required two written warnings, a suspension, and then termination. He testified that the claimant had received written warnings for minor matters and had been suspended without pay for the first week *466 of December 2015 for her role in running an illegal football betting pool at work. (The other two participants, who had larger roles in the enterprise, were fired.) Thus, he testified, when it was learned that she had violated company policy by failing to properly report her thumb/wrist issue in July 2015, the next step of discipline was termination.
In his deposition, Dr. Mead testified that he first saw the claimant on August 18, 2015, at which time she complained about foot pain, right knee pain, and right wrist pain. As to the wrist, he made no specific diagnosis at that time. He noted some swelling of the wrist; he prescribed a splint and an oral steroid and excused her from work for a week. He next saw her on January 4, 2016, for a complaint of right hand and wrist pain which she rated as eight out of ten on a pain scale of one to ten. He noted swelling and tenderness of the wrist and diagnosed DQT, an inflammation around the tendons that go through a particular area of the wrist, specifically over the radial styloid, which is the thumb side of the wrist. He gave her an injection of cortisone and anesthetic. This treatment was repeated when she returned on January 11, 2016. At her appointment on January 18, 2016, she reported a decreased pain level of five out of ten; Dr. Mead opined that this was probably due to the injections. Dr. Mead then started her on occupational therapy ("OT"). At her appointment on February 8, 2016, she was improved due to the OT. He recommended a surgical release procedure, which she declined.[1] Thereafter, he continued to see her periodically. When he last saw her on February 27, 2017, she reported her pain level as two out of ten. Dr. Mead testified that, in his opinion, there is no cause for DQT. He noted that he saw it in "all types of people," usually those aged 40 and above. In his experience, it was not confined to just people who did repetitive work. He also stated that it was more likely than not that her occupation as a customer service representative aggravated her DQT and probably restricted her ability to perform her job.
Dr. Odinet testified that he was board certified in otolaryngology, head and neck surgery, and plastic and reconstructive surgery. His expertise in hand surgery was part of his plastic surgery training. Hand surgery comprised 20% to 30% of his practice; early in his career, it had been closer to 90%. He estimated that he performed about 20 DQT correction surgeries per year. After examining the claimant and reviewing her medical records, he concluded that she had DQT, which had been treated for quite some time without much significant long-term success. He too recommended a surgical release procedure, which he estimated to have a 90% success rate. Dr. Odinet testified that he did not believe that her work as a customer service representative caused her DQT. Like Dr. Mead, he said that he had never heard of any specific cause for DQT. While blunt trauma or a fracture could cause it, he noted that "[p]eople just pop up with it." In his report, he said that the claimant's job could have possibly aggravated the condition. He opined that her work did not cause the condition to worsen, but just made it more symptomatic.
On October 4, 2017, the WCJ issued a written opinion in which she found in favor of the defendants. The WCJ noted the claimant's contention that her DQT was an occupational disease arising from or caused by her employment, as opposed to *467 the employer's claim that her DQT was not an occupational disease or caused by her job. It then closely scrutinized the medical evidence presented at trial. After reviewing La. R.S. 23:1031.1 and the jurisprudence, the WCJ concluded that the claimant had failed to establish that she suffered from an occupational disease "due to causes and conditions characteristic of and peculiar to" her employment as a Frymaster customer service representative.[2] The WCJ stated that the claimant's testimony was not corroborated by the surrounding evidence or the testimony of the medical expert witnesses. The WCJ further found that the medical records and testimony failed to show by a preponderance of the evidence that the claimant suffered from an occupational disease that originated from her Frymaster's job. Judgment denying and dismissing the employee's claims was signed October 4, 2017.
The claimant appeals.
OCCUPATIONAL DISEASE
The claimant contends that the WCJ legally erred in applying a narrow definition of "occupational disease" in the Fite case instead of a supposedly broader one in Thomas v. Hollywood Casino , 44,271 (La. App. 2 Cir. 5/13/09), 13 So.3d 717. Due to this alleged error in law, she seeks application of a de novo standard of review, not manifest error. The claimant further argues that, because the WCJ failed to apply the correct definition, she wrongly found that the claimant failed to prove that she suffers from a disabling occupational disease. The claimant argues that because the defendants did not present any evidence of any other jobs available to her, she is entitled to either temporary total disability benefits or supplemental earnings benefits with zero offset.
The defendants argue that the WCJ properly applied the statutory definition of "occupational disease" and that manifest error is the appropriate standard of review. They also distinguish the Thomas case on several grounds: (1) it involved CTS, which is specifically included in La. R.S. 23:1031.1, whereas DQT is not; (2) the Thomas treating doctor's "unusually emphatic"
*468 opinion was that the claimant's CTS was the result of her repetitive work, whereas Dr. Mead testified that he did not know the cause for DQT; and (3) the employer in Thomas offered no evidence to dispute the treating doctor's "emphatic" opinion, whereas Frymaster presented Dr. Odinet's testimony.
Law
In relevant part, La. R.S. 23:1031.1 provides:
A. Every employee who is disabled because of the contraction of an occupational disease as herein defined ... shall be entitled to the compensation provided in this Chapter the same as if said employee received personal injury by accident arising out of and in the course of his employment.
B. An occupational disease means only that disease or illness which is due to causes and conditions characteristic of and peculiar to the particular trade, occupation, process, or employment in which the employee is exposed to such disease . Occupational disease shall include injuries due to work-related carpal tunnel syndrome. Degenerative disc disease, spinal stenosis, arthritis of any type, mental illness, and heart-related or perivascular disease are specifically excluded from the classification of an occupational disease for the purpose of this Section. [Emphasis added.]
In Hymes v. Monroe Mack Sales , 28,768 (La. App. 2 Cir. 10/30/96), 682 So.2d 871, the court explained:
The expression "characteristic of and peculiar to," as used in § 1031.1 B, does not mean that the disease occurs only in persons engaged in the particular employment and not otherwise found among the general public. Rather, it means that the disease must result from the conditions and causes present in the employment and not from other causes to which the claimant and everyone else might have been exposed. Stated otherwise, it means that the disease must originate from conditions in the employment that result in a hazard that distinguishes the employment in character from the general run of occupations. (Internal citations omitted.)
An occupational disease is one in which there is a demonstrated causal link between the particular disease or illness and the occupation. Arrant v. Graphic Packaging Int'l, Inc. , 13-2878 (La. 5/5/15), 169 So.3d 296.
The claimant asserting an occupational disease must prove, by a preponderance of the evidence, a disability related to an employment-related disease, that it was contracted during the course of employment, and that it is the result of the work performed. Murphy v. Graphic Packaging, Inc. , 47,834 (La. App. 2 Cir. 4/10/13), 112 So.3d 1040 ; Fortner v. Guide Corp. , 44,849 (La. App. 2 Cir. 12/16/09), 27 So.3d 1035.
The causal link between an employee's occupational disease and work-related duties must be established by a reasonable probability. The claimant will fail if there is only a possibility that the employment caused the disease, or if other causes not related to the employment are just as likely to have caused the disease. Atkins v. DG Foods , 48,490 (La. App. 2 Cir. 9/25/13), 125 So.3d 530 ; Fortner v. Guide Corp. , supra .
Expert testimony is required to support a finding of an occupational disease. Atkins v. DG Foods, supra ; Murphy v. Graphic Packaging, Inc., supra ; Fortner v. Guide Corp., supra ; Carrodine v. Pilgrim's Pride Corp. , 43,902 (La. App. 2 Cir. 3/11/09), 4 So.3d 1020, writ denied , 09-0976 (La. 6/19/09), 10 So.3d 741 ; Hymes v. Monroe Mack Sales, supra . A court should *469 not find an occupational disease solely on the basis of lay testimony. Atkins v. DG Foods, supra .
The WCJ's factual findings are subject to manifest error review. Ball v. Wendy's Int'l, Inc., supra . In applying the manifest error or clearly wrong standard, the court must determine not whether the trier of fact was wrong, but whether the fact finder's conclusion was a reasonable one. Stobart v. State through Dep't of Trans. & Dev. , 617 So.2d 880 (La. 1993). Whether the claimant has carried her burden of proof and whether testimony is credible are questions of fact to be determined by the WCJ. Bradford v. Webster Par. Police Jury , 48,981 (La. App. 2 Cir. 5/14/14), 139 So.3d 39 ; Holmes v. Nursecare Nursing & Rehab. Ctr. , 47,999 (La. App. 2 Cir. 7/24/13), 121 So.3d 720 ; Taylor v. Hollywood Casino , 41,196 (La. App. 2 Cir. 6/28/06), 935 So.2d 293. The fact finder's choice between two permissible views of the evidence cannot be clearly wrong. Hymes v. Monroe Mack Sales, supra .
Discussion
The crux of the claimant's argument on appeal is her contention that this circuit pronounced a broader definition for "occupational disease" in Thomas than was found in Fite III . However, our review of Thomas, supra , reveals that the court merely distinguished the case before it from the facts of Fite III . It found that the claimant in Fite III failed to offer convincing medical evidence of causation. In the Thomas case, the claimant presented the "unusually emphatic" opinion of her treating orthopedist that her CTS resulted from her repetitive work. On the other hand, the employer offered "absolutely no evidence" to dispute the opinion of the treating doctor. Consequently, the Thomas court held that the employer's "technical contention that the claimant did not describe 'causes and conditions characteristic of and peculiar to' her trade will not countervail the strong medical evidence."
Finding no legal error as asserted by the claimant, we review this matter under the manifest error standard. We find that the instant case does not contain the same "strong medical evidence" as Thomas, supra . To the contrary, neither the treating physician, Dr. Mead, nor the second opinion doctor, Dr. Odinet, was able to opine that the claimant's DQT was caused by her job. At most, they indicated that her work may have aggravated the DQT and made her more symptomatic.
The claimant argues that her DQT is akin to CTS and, consequently, should be treated in similar fashion. However, we note that CTS is specifically included in La. R.S. 23:1031.1(B) as an occupational disease. Nonetheless, even though CTS is so enumerated, compensation will be denied if a causal relationship between the syndrome and employment was not proven by the claimant. See Atkins v. DG Foods, supra ; Murphy v. Graphic Packaging, Inc., supra .
Without expert medical evidence establishing that, more probably than not, the claimant's DQT was caused by her repetitive typing as a Frymaster employee, we are constrained to find no manifest error in the WCJ's determination that the claimant failed to carry her burden of proof.
Based on the foregoing, we affirm the WCJ's ruling which denied the relief sought by the claimant and dismissed her claims.[3]
*470 ATTORNEY FEES AND PENALTIES
The claimant requested that she be awarded $25,000 in attorney fees and $8,000 in penalties because she was forced to pursue this appeal, while the defendants contended that the claimant is not entitled to attorney fees or penalties because Frymaster's actions were reasonable. In view of our ruling on the merits, discussion of this assignment of error is pretermitted. An unsuccessful claimant is not entitled to penalties and attorney fees. Patterson v. Gen. Motors Co. , 46,559 (La. App. 2 Cir. 9/21/11), 73 So.3d 465.
CONCLUSION
We affirm the ruling of the workers' compensation judge denying the claims of the appellant, Rhonda Johnson.
Costs are assessed against the appellant, Rhonda Johnson.
AFFIRMED.

The claimant indicated that she did not want the surgery due to her 2014 diabetes diagnosis. However, Dr. Mead testified that her diabetes was not a contraindication for the surgery, which he estimated to have an 80% to 90% chance of success.

In her ruling, the WCJ cited Fite v. Louisiana Title Co. ("Fite III "), 36,393 (La. App. 2 Cir. 10/24/03), 859 So.2d 259, writ denied , 03-3230 (La. 2/20/04), 866 So.2d 829, and Ball v. Wendy's Int'l, Inc. , 36,922 (La. App. 2 Cir. 3/5/03), 839 So.2d 1208, writ denied , 03-0978 (La. 5/30/03), 845 So.2d 1056, for the proposition that the phrase "characteristic of and peculiar to" found in La. R.S. 23:1031.1(B) meant that "the disease must originate from conditions in the employment that result in a hazard that distinguishes the employment in character from the general run of occupations."
This specific language was actually found in the appellate court's decision in Fite v. Louisiana Title Co. ("Fite I "), 36,393 (La. App. 2 Cir. 9/18/02), 828 So.2d 165, writ granted, judgment set aside Fite v. Louisiana Title Co. ("Fite II "), 02-2607 (La. 6/27/03), 852 So.2d 983. In Fite I , the appellate court reversed the WCJ's finding of occupational diseases due to insufficient medical proof. In Fite II , the Louisiana Supreme Court reversed the appellate court on the basis that it erred in holding that live expert testimony was required at the hearing to support the WCJ's finding of an occupational disease and in failing to consider medical records evidence that was erroneously concluded to be not properly admitted at trial. The supreme court remanded the matter to the appellate court for review under the manifest error standard, which applies to workers compensation actions "even when the evidence before the trier of fact consists solely of written reports, records, and depositions." On remand in Fite III , the appellate court again reversed the WCJ ruling in favor of the claimant on the grounds that the claimant failed to prove that her conditions were "due to causes and conditions characteristics of and peculiar to" her particular job as a title examiner.

We are not without sympathy for the claimant, whose termination for not reporting the onset of her pain appears to be rather heavy-handed under the circumstances presented here. The employer and its insurer have successfully resisted the claim for workers' compensation benefits while the basis for her termination stemmed from her untimely reporting of a claim they contend is without merit.